**Leslea Diane WHITE, individually and as next friend for C.E.W. and Z.A.W., Appellants,**

v.

**Elizabeth Michelle WHITE, n/k/a Elizabeth Michelle Crowe, Respondent.**

No. WD 69580.

Missouri Court of Appeals, Western District.

June 23, 2009.

Application for Transfer to Supreme Court Denied July 28, 2009.

Application for Transfer Denied Oct. 6, 2009.

Susan Sommer, for Appellants.

Melissa Faurot, for Respondent.

Before VICTOR C. HOWARD, Presiding Judge, JOSEPH M. ELLIS, Judge and ALOK AHUJA, Judge.

JOSEPH M. ELLIS, Judge.

Leslea Diane White ("Leslea") appeals from a judgment entered in the Circuit Court of Boone County dismissing without prejudice her "Petition for Declaration of Maternity, For Order of Custody and For Order of Child Support" related to minors C.E.W. and Z.A.W. For the following reasons, the judgment is affirmed.

### I. Factual Background

Leslea and Elizabeth Michelle White ("Michelle") were involved in a committed same-sex relationship for approximately eight years beginning in 1997. During the relationship, Michelle changed her last name to White, and she and Leslea each conceived a child through artificial insemination using the same anonymous sperm donor.[1] Michelle is the biological mother of C.E.W., who was born December 15, 2001, and Leslea is the biological mother of Z.A.W., who was born July 27, 2004. Leslea and Michelle lived together with the children until their relationship terminated in November 2005. For the next several months, the children lived part of the time with Leslea and part of the time with Michelle. In late May 2006, Michelle refused to allow Leslea or Z.A.W. to have any contact with C.E.W., refused to accept Leslea's offers of financial support for C.E.W., and stopped seeking contact with Z.A.W. or contributing to his financial support. It appears that neither the children nor the women have had any contact with each other since that date.

On January 18, 2007, Leslea filed a "Petition for Declaration of Maternity, For Order of Custody and For Order of Child Support" in the Circuit Court of Boone County as an individual and as next friend for C.E.W. and Z.A.W. She asserted that neither child has a natural or presumed father and prayed for the court to declare both women to be the legal parents of both children based on their alleged joint decisions to conceive the children and their relationships with the children. She asked the court to enter an award of joint legal and physical custody[2] as to both children and to order both women to pay reasonable child support.

Michelle subsequently filed a motion to dismiss the petition for lack of standing and failure to state a claim upon which relief may be granted. Michelle argued that Leslea is not biologically related to C.E.W., that no statute provides for declaration of "maternity" of a non-biologically related female, and that Leslea has no standing to assert a claim of parentage under the Uniform Parentage Act,

---

1. The sperm donor waived all parental rights to both children; his identity is unknown, and he has never been involved in the children's lives or in these proceedings.

2. In the alternative, Leslea prayed for the court to award primary physical custody of both children to her and to award Michelle reasonable visitation. However, Leslea represented to this Court that she is not seeking to remove C.E.W. from Michelle's physical custody but only to "share" custody.

§§ 210.817–210.852 [3] ("the MoUPA"). Michelle further argued that the MoUPA is the exclusive means to determine parentage in Missouri and that the MoUPA does not provide for determination of a *de facto,* equitable, or psychological parent-child relationship.

In response to the motion to dismiss, Leslea argued that she has standing as an "interested party" concerning the parentage of both children under § 210.848 of the MoUPA, which she refers to as the "maternity provision." She further argued that she has standing because the MoUPA supplements the common law, which she asserts permits the court to exercise its *parens patriae* authority to protect the children's best interests by recognizing that Michelle and Leslea are *de facto* parents and stand *in loco parentis* to Z.A.W. and C.E.W., respectively. Finally, Leslea argued that, if the court refuses to recognize her as a parent under the MoUPA or under its *parens patriae* authority, she has standing as a third party under the common law exceptional circumstances doctrine.

After appointing a guardian ad litem to represent the children, holding several hearings, and considering numerous memoranda filed by the parties, a Family Court commissioner denied the motion to dismiss. Michelle requested and was granted a rehearing before a Family Court judge. After considering all of the pleadings filed by the parties, the court granted the motion and dismissed the petition without prejudice without indicating its reasoning.

Leslea brings ten points on appeal from that judgment.[4]

## II. *Appealability*

■ " 'The general rule is that a dismissal without prejudice is not a final judgment and, therefore, is not appealable.' " *Jones v. Jackson County Circuit Court,* 162 S.W.3d 53, 57 (Mo.App. W.D. 2005) (quoting *Chromalloy Am. Corp. v. Elyria Foundry Co.,* 955 S.W.2d 1, 3 (Mo. banc 1997)). "Nevertheless, '[w]hen the effect of the order is to dismiss the plaintiff's action and not the pleading merely, then the judgment entered is final and appealable' " because the dismissal " 'amounts to an adjudication on the merits.' " *Id.* at 57–58 (quoting *Mahoney v. Doerhoff Surgical Servs., Inc.,* 807 S.W.2d 503, 506 (Mo. banc 1991)).

■ In the case at bar, the trial court did not indicate the reasoning for its dismissal of Leslea's petition. Where the trial court does not state a basis for dismissal, we presume it was based on the grounds alleged in the motion to dismiss, and we will affirm if the dismissal is proper under any of the grounds stated in the motion. *Dudley v. Southern Union Co.,* 261 S.W.3d 598, 601 (Mo.App. W.D.2008). As noted *supra,* Michelle moved to dismiss the petition for lack of standing and failure to state a claim upon which relief may be granted. "[D]ismissals without prejudice have been held appealable ... where the dismissal was based on ... a plaintiff's lack of standing [or] failure of the petition to state a· claim where the plaintiff chose not to plead further[.]" *Doe v. Visionaire*

---

3. All statutory citations are to RSMo 2000 unless otherwise noted.

4. Two amicus curiae briefs have been filed with this court in support of Leslea and the children's claims: one by the National Association of Social Workers and the National Association of Social Workers, Missouri Chapter; and the other on behalf of the American Civil Liberties Union of Eastern Missouri, American Civil Liberties Union of Kansas and Western Missouri, and American Civil Liberties Union Lesbian, Gay, Bisexual, Transgender & Aids Project.

*Corp.*, 13 S.W.3d 674, 676 (Mo.App. E.D. 2000); *see also Long v. Cross Reporting Servs., Inc.*, 103 S.W.3d 249, 252–53 n. 4 (Mo.App. W.D.2003). Thus, the dismissal of Leslea's petition is appealable even though it was without prejudice.

### III. Standard of Review

■ Our review of a dismissal for failure to state a claim or for lack of standing is *de novo. Lynch v. Lynch*, 260 S.W.3d 834, 836 (Mo. banc 2008). When reviewing for failure to state a claim, we treat the facts contained in the petition as true and construe them liberally in favor of the plaintiffs. *Id.* The petition states a cause of action if it "sets forth any set of facts that, if proven, would entitle the plaintiffs to relief." *Id.* Similarly, "[t]his court determines standing as a matter of law on the basis of the petition, along with any other non-contested facts accepted as true by the parties at the time the motion to dismiss was argued, and resolve[s] the issue as a matter of law on the basis of the undisputed facts." *State ex rel. Dep't of Soc. Servs., Family Support Div. v. K.L.D.*, 118 S.W.3d 283, 287 (Mo.App. W.D.2003).

### IV. Standing

Leslea's first seven points generally address the issue of standing.[5] In Point I, Leslea asserts that the trial court erred in dismissing the petition because she and the children have standing to bring an action to determine a mother-child relationship under the MoUPA. In Points II through VII, she contends that the court erred in dismissing the petition because, even if she and the children have no standing under the MoUPA, she has standing under common law and equitable principles.

■ "Standing is a jurisdictional matter antecedent to the right to relief." *Farmer v. Kinder*, 89 S.W.3d 447, 451 (Mo. banc 2002). Standing inquires into "whether the persons seeking relief have a right to do so." *Id.* "Standing requires that a party seeking relief have a legally cognizable interest in the subject matter and that he has a threatened or actual injury." *Eastern Mo. Laborers Dist. Council v. St. Louis County*, 781 S.W.2d 43, 46 (Mo. banc 1989). "Where, as here, a question is raised about a party's standing, courts have a duty to determine the question of their jurisdiction before reaching substantive issues, for if a party lacks standing, the court must dismiss the case because it does not have jurisdiction of the substantive issues presented." *Farmer*, 89 S.W.3d at 451. That is to say, " '[r]egardless of the merits of appellants' claims, without standing, the court cannot entertain the action.' " *Pace Constr. Co. v. Missouri Highway & Transp. Comm'n*, 759 S.W.2d 272, 274 (Mo.App. W.D.1988) (quoting *Champ v. Poelker*, 755 S.W.2d 383, 387 (Mo.App. E.D.1988)). " 'Lack of standing can not be waived....' " *Aufenkamp v. Grabill*, 112 S.W.3d 455, 458 (Mo.App. W.D.2003) (quoting *State ex rel. Mink v. Wallace*, 84 S.W.3d 127, 129 (Mo.App. E.D. 2002)).

■ Appellate review of a trial court's determination regarding a litigant's standing is *de novo*, with no deference given to the lower court's decision. *Blue Cross & Blue Shield of Mo. v. Nixon*, 81 S.W.3d 546, 551 (Mo.App. W.D.2002). "We determine standing as a matter of law on the basis of the petition and the undisputed facts." *Id.*

---

5. In her last three points, Leslea argues that the dismissal of the petition resulted in her and the children being unconstitutionally deprived of their rights to due process (Point VIII), equal protection (Point IX), and access to the courts (Point X).

## A. MoUPA

Leslea's first point concerns the MoUPA. "When interpreting a statute, we are to determine the intent of the legislature, giving the language used its plain and ordinary meaning, and give effect to that intent, if possible." *State v. Redifer*, 215 S.W.3d 725, 732 (Mo.App. W.D.2006) (internal quotation omitted). "[T]he construction of statutes is not to be hyper-technical, but instead is to be reasonable and logical and to give meaning to the statutes." *Gash v. Lafayette County*, 245 S.W.3d 229, 232 (Mo. banc 2008) (internal quotation and brackets omitted). "[A] particular statutory phrase cannot be read in isolation," and "the provisions of a legislative act are construed together and read in harmony with the entire act." *Id.* (internal quotation, brackets, and ellipses omitted). " 'The words in a statute are presumed to have meaning, and any interpretation rendering statutory language superfluous is not favored.' " *State v. Payne*, 250 S.W.3d 815, 819 (Mo.App. W.D. 2008) (quoting *Schoemehl v. Treasurer of Mo.*, 217 S.W.3d 900, 902 (Mo. banc 2007)).

Leslea first contends that she and the children each have standing to bring a claim to establish a mother-child relationship pursuant to § 210.826.2. That section provides, in pertinent part:

> An action to determine the existence of the father and child relationship with respect to a child who has no presumed father under section 210.822 may be brought by the child, the mother or the person who has legal custody of the child, any person having physical or legal custody of a child for a period of more than sixty days, the division of child support enforcement, ... [or] a man alleging himself to be the father....

§ 210.826.2. Leslea then notes that § 210.848 directs that "[i]nsofar as possible, the provisions of sections 210.817 to 210.852 applicable to the father and child relationship apply to the mother and child relationship." She then argues that she has standing under § 210.826.2 because she (1) is a legal and biological mother of Z.A.W., (2) had physical custody of C.E.W. for over four years, and (3) asserts herself to be a mother of C.E.W. Finally, she claims that the children are expressly granted standing to bring the action by § 210.826.2.

Leslea's argument cannot withstand statutory analysis. A gender-neutral reading of § 210.826.2 requires us to insert the word "mother" for "father" in all instances. Doing so results in the statute reading as follows: "An action to determine the existence of the [mother] and child relationship with respect to a child who has no presumed [mother] under subsection 1 of section 210.822" may be brought by the specified individuals. If C.E.W. or Z.A.W. had no known or presumed mother, Leslea's argument regarding standing might have merit. But in this case, the petition alleges, and the parties concede, that Michelle is the biological mother of C.E.W. and that Leslea is the biological mother of Z.A.W. There is no dispute as to the identity of each child's natural or presumed mother. Accordingly, neither the child nor any other individual is authorized to bring suit to declare a mother-child relationship under § 210.826.2.

Next, Leslea argues that she and the children have standing to bring an action to declare a mother-child relationship under § 210.848, which provides that "[a]ny interested party may bring an action to determine the existence or nonexistence of a mother and child relationship." Leslea asserts that the children are clearly interested parties and that she is an interested party as Z.A.W.'s biological mother and as a person who "has functioned as

C.E.W.'s mother from birth and who asserts a claim to be C.E.W.'s legal parent." She insists that construing the statute as providing "standing solely for biological parents ... contradicts the statute's plain terms and renders the phrase '[a]ny interested party' meaningless."

In support of her contention, Leslea simply states that "[o]ther state courts have interpreted the term 'interested party' in the UPA as applying to non-biological parents," and, without further case analysis or discussion, quotes the following language from *Rubano v. DiCenzo*, 759 A.2d 959 (R.I.2000):

> an 'interested party' under [the UPA's maternity provision] may include a person who, though he or she has no biological connection with a child, nonetheless has functioned as a parent in relation to that child and has been held out to the community as the child's parent by the biological parent.

*Id.* at 969.

While *Rubano* is factually similar to the case at bar and the statutory provision on which the case turned is identical to Missouri's § 210.848, we do not find the reasoning expressed therein particularly persuasive, much less compelling. The case was decided nine years ago and was based in large part on a unique statutory scheme. Rhode Island adopted only ten of the thirty sections from the Model UPA, combining those with six sections from the Uniform Act on Paternity, 9B ULA 347–68 (1987), and twelve sections that are unique to Rhode Island, *id.* at 970, while Missouri adopted the Model UPA almost in its entirety, *see infra.*

Rather than rely on *Rubano*, we find Missouri's statutory scheme dispositive of this issue. The MoUPA defines a "parent" as "either a natural or adoptive parent." § 210.817(3).[6] It provides that the relationship of a natural mother "may be established by proof of her having given birth to the child, or under the provisions of sections 210.817 to 210.852," § 210.819(1), and the relationship of a natural father "may be established under the provisions of sections 210.817 to 210.852," §. 210.819(2). Unlike the Uniform Parentage Act of 1973 ("the Model UPA") upon which the MoUPA was based, the MoUPA does not provide that a man is presumed to be the natural father if "while the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child." *See Unif. Parentage Act* § 4(a)(4) (1973), 9B U.L.A. 394 (2001). Instead, the MoUPA provides that, in addition to several presumptions based upon marriage or attempted marriage, §§ 210.822.1(1)–(3), a man is presumed to be the father of a child if an expert concludes that blood tests show that he is not excluded as a parent and the probability of paternity is at least 98%. § 210.822.1(4). Notably, this last presumption is not in the Model UPA. The MoUPA further provides that evidence that blood tests show that a man is not the biological father is "conclusive of nonpaternity and the court shall dismiss the action as to that party." § 210.834.4. For cases involving artificial insemination, the MoUPA provides that a husband who consents in writing to his wife being artificially in-

---

**6.** Leslea argues in a footnote that she also has standing under this provision because "natural parent" should be interpreted to mean an individual who has obtained "parent status through any recognized means other than adoption," including through "biological relationship, equitable doctrine, or statutory presumption." This claim has no merit because the plain and ordinary meaning of "natural parent" is a biological mother or father or a birth mother, which may not be the biological mother in cases of surrogate parenthood. *See Black's Law Dictionary* 640, 1035–36 (8th ed.2004).

seminated with semen donated by another man "is treated in law as if he were the natural father of a child thereby conceived," § 210.824.1, and the semen donor under such circumstances is "treated in law as if he were not the natural father." § 210.824.2.

The Prefatory Notes and Comments to the Model UPA provide some guidance as to the intended scope of § 210.848. "[W]hen the legislature adopts a model act, we must presume that the General Assembly intended to adopt the interpretation of that section contained in the applicable comments to the model act. . . ." *State v. Slavens*, 190 S.W.3d 410, 413 (Mo. App. S.D.2006) (internal quotation omitted). The Prefatory Note explains that an action "on the question of maternal descent" is permitted to "cover the rare case in which there may be uncertainty as to the mother." *Unif. Parentage Act, Prefatory Note* (1973), 9B U.L.A. 379 (2001). Similarly, the Comment to the section enacted as § 210.848 indicates that it "permits the declaration of the mother and child relationship where that is in dispute" and that "it is not believed that cases of this nature will arise frequently." *Unif. Parentage Act § 21, Comment* (1973), 9B U.L.A. 494 (2001). These notes and comments, conjoined with the additional provisions in the MoUPA concerning blood tests, make it clear that, while an "interested party" need not be biologically related to a child to initiate an action to declare a parent-child relationship under the MoUPA, the action itself must be to declare a biological relationship.

Reading all of the statutory provisions together, and giving the language its plain and ordinary meaning, the conclusion is inescapable that the MoUPA only allows claims for declaration of a parent-child relationship based on a biological tie or a presumption due to marriage or attempted marriage (either through the paternity presumptions under § 210.822 or by consenting to their wives' artificial insemination as provided in § 210.824). Similarly, it provides standing only to biological parents, men that may not be biologically related but are presumed legal fathers, or interested persons seeking a declaration of the existence or non-existence of a biological mother-child relationship. Because neither Leslea nor the children is seeking declaration of the existence of a biological relationship and none of the parental presumptions apply, the trial court did not err in dismissing the petition based on a lack of standing to bring the action pursuant to the MoUPA.

### B. Non-statutory claims

Leslea next asserts, in Point II through VI, that she has standing based on several "equitable parent" doctrines that she claims are recognized in Missouri and allow her to seek relief, including (1) a *de facto* parent claim, (2) standing *in loco parentis* to Michelle's daughter, (3) equitable estoppel against Michelle, and (4) the "exceptional circumstances doctrine." Michelle, on the other hand, generally argues that the MoUPA is the exclusive means to determine parentage in Missouri and that none of the equitable doctrines asserted by Leslea are applicable. If Michelle is correct, then we need not address any of Leslea's equitable claims because they would have no merit. Accordingly, we first address whether the MoUPA is the exclusive means to determine parentage.

### 1. Non–Exclusivity of the MoUPA

The MoUPA was enacted in 1987. Between 1987 and 2002, as noted in *In Re Marriage of Fry*, 108 S.W.3d 132, 135 (Mo. App. S.D.2003), discussed *infra*, there were numerous cases holding that the MoUPA was the exclusive method for de-

termining paternity in Missouri. As early as 1996, however, it was becoming apparent that such was not the case.

The Missouri Supreme Court, in *In re Nocita*, 914 S.W.2d 358 (Mo. banc 1996), held that "[b]ecause the legislature passed the Parentage Act without conforming the Probate Code, the General Assembly refused to make the Parentage Act the exclusive means to establish paternity for probate." *Id.* at 359. Accordingly, the Court held that the provisions of the probate code authorizing establishment of paternity during probate, specifically §§ 473.070.2 and 474.060, were applicable in that case. *Id.* That same year, the Eastern District of this Court noted that the legislature amended § 454.200(4) (part of the Uniform Reciprocal Enforcement of Support Law ("URESA")) to provide that "[i]n any proceeding under [this Act] in which paternity is at issue, the provisions of sections 210.822 and 210.834, RSMo, shall apply." *State ex rel. State of Ill. v. Schaumann*, 918 S.W.2d 393, 396 (Mo.App. E.D.1996). Accordingly, the court held that "by adopting only a portion of the UPA procedures into URESA, it is now clear that the legislature no longer intends for the UPA to be the exclusive procedure for adjudication of paternity issues." *Id.* at 397. This court reached the same result shortly thereafter in *State of Washington ex rel. Lewis v. Collis*, 963 S.W.2d 700, 702–03 (Mo.App. W.D.1998).

In *LeSage v. Dirt Cheap Cigarettes & Beer, Inc.*, 102 S.W.3d 1, 4 (Mo. banc 2003), our Supreme Court expressly rejected the contention that the MoUPA is the exclusive means of proving paternity, relying on *Nocita*. It noted that the wrongful death statute provides that the father of a deceased child may bring a wrongful death action, but does not specify how paternity is to be determined, and pointed out that MoUPA "does not explic-itly provide that it is the 'exclusive' means to prove paternity." *Id.* The Court, therefore, held that the procedural requirement of the MoUPA that the child must be made a party to an action for the establishment of paternity could not be used to defeat a putative father's wrongful death action. *Id.*

Not long after *LeSage*, *In Re Marriage of Fry*, 108 S.W.3d 132 (Mo.App. S.D. 2003), was handed down. *Fry* was a dissolution action wherein Husband's paternity was decided as to the one child born during the marriage. *Id.* at 134–35. On appeal, Husband argued that any determination of paternity must comply with the MoUPA's procedures for determining paternity and that the trial court did not adhere to those procedures. *Id.* at 135. The *Fry* court rejected that premise, observing that the Uniform Reciprocal Enforcement of Support Law ("URESA") and the Uniform Interstate Family Support Act ("UIFSA") both provide for determination of paternity and implicitly or explicitly provide that only limited provisions of the MoUPA shall apply in such actions. *Id.* at 135–36. The court concluded its discussion of the subject stating:

> Given the foregoing, we are unable to conclude in general terms that the UPA is truly the exclusive method for determining paternity in Missouri. Clearly, Missouri's statutory scheme contemplates otherwise. Nevertheless, we remain persuaded that an underlying purpose of the UPA is indeed to provide "a uniform method for determining paternity which would protect the rights of all parties involved, especially the children." Indeed, the UPA itself states that its provisions "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of [the Act] among the states enacting it." With this laudable legisla-

tive goal in mind, courts do well to mandate that the procedural requirements of the UPA be applied in cases where parentage is contested and where no provision for adjudicating that issue outside the UPA appears applicable. If it is an over-generalization to state that the UPA is the exclusive means to determine paternity in this state, it is not too much to say that the legislature intended that it be applied as uniformly and universally as is appropriate and that courts should, therefore, seek to effectuate that goal whenever possible.

*Id.* at 136 (citations omitted). Accordingly, the court ultimately held that the MoUPA's "provisions for determining paternity should apply in dissolution actions where paternity is contested." *Id.*

 In short, the MoUPA is not the exclusive method for determining parentage in Missouri. Any recognized statutory or equitable proceedings not conformed to the MoUPA are still viable alternatives. But, consistent with *Fry,* the procedural requirements of the MoUPA should "be applied in cases where parentage is contested and where no provision for adjudicating that issue outside the [MoUPA] appears applicable." *Id.*

### 2. Parens Patriae

 Leslea's first equitable argument appears in Point II of her brief wherein she complains that the circuit court erred in dismissing the action "in that it failed to exercise its *Parens Patriae* responsibility to apply common law and equitable principles to safeguard the best interests of children raised in diverse family structures." Leslea's Point Relied On clearly fails to comply with Rule 84.04(d)(1).

Rule 84.04(d) provides, in pertinent part: (1) Where the appellate court reviews the decision of a trial court, each point shall:

(A) identify the trial court ruling or action that the appellant challenges;

(B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

The point shall be in substantially the following form: "The trial court erred in [identify the challenged ruling or action], because [state the legal reasons for the claim of reversible error], in that [explain why the legal reasons, in the context of the case, support the claim of reversible error]."

Thus, the rule requires that a proper point relied on must: (1) identify the ruling or action of the trial court that is being challenged on appeal; (2) state the legal reason or reasons for the claim of reversible error; and (3) explain in summary fashion why, in the context of the case, the legal reason or reasons support the claim of reversible error. Compliance with Rule 84.04 briefing requirements is mandatory in order to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made.

*Bridges v. American Family Mut. Ins. Co.,* 146 S.W.3d 456, 458 (Mo.App. W.D. 2004) (internal citations omitted).

Leslea's Point Relied On "is nothing more than an abstract statement of the law, which is unacceptable in satisfying the requirements of Rule 84.04(d)." *Id.* The argument section under this point is similarly deficient. It fails to identify or explain the specific legal reasons that support the claim of reversible error. The point preserves nothing for appellate review and is, therefore, denied. *Landwehr*

*v. Landwehr,* 129 S.W.3d 395, 398 (Mo. App. W.D.2004).

*Ex gratia,* we note that the apparent intent of this Point, based on the argument, was to provide support for the concept of an "equitable parent" by discussing and citing extensive sociological and psychological authority for the concept. Indeed, the argument concludes with this statement: "This Court should exercise its *parens patriae* authority and rely on the established common law and equitable principles as well as statutory directives discussed below to protect C.E.W.'s and Z.A.W.'s relationships with both the adults who are their parents and with one another." Thus, it appears that the purpose of this "Point Relied On" is not to present an individual claim of reversible error but, rather, a general equitable and/or policy argument in support of the claims raised in subsequent points. In any event, to the extent it was intended as an independent point of error, it fails.

### 3. *De facto parent* and *in loco parentis* claims

In Points III and IV, Leslea asserts that she has standing and stated a claim for relief on the basis of her being the *de facto* parent of, or one standing *in loco parentis* to, C.E.W., and Michelle being the *de facto* parent of, or one standing *in loco parentis* to, Z.A.W. Leslea claims that equitable parenting doctrines, whether identified as *de facto* parentage or standing *in loco parentis,* "uniformly are based on the over-arching principle that it is in the child's best interest to maintain his or her relationship with a person who, in all respects but genetics, is the child's parent." She cites the American Law Institute, *Principles of the Law of Family Dissolu-*

*tion* § 2.03(1)(c) (2003) [7] for a definition of *de facto* parent.

Leslea argues that the concept was recognized under the rubric "equitable parent" in *In re T.L.,* No. 953–2340, 1996 WL 393521 (Mo.Cir. May 7, 1996). *In re T.L.* is an unappealed decision of the circuit court of the City of St. Louis. We have reviewed the decision, and it seems clear that it was a consent judgment, particularly in light of the fact that it was not appealed. More importantly, however, circuit court judgments are not binding authority. *See e.g., Mo. Const. art. V, §§ 2– 4.* Accordingly, we do not view the decision as having precedential value nor do we find it particularly persuasive since it was so obviously an agreed upon judgment.

Next, Leslea cites *In re Custody of H.S.H.–K,* 193 Wis.2d 649, 533 N.W.2d 419 (1995), for the standard most commonly used for demonstrating a *de facto* parenting relationship:

(1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.* at 435–36. She then argues that the petition alleges that she and Michelle meet

7. Missouri courts have not adopted this particular treatise or any provisions thereof. In-

deed, we have found no previous citations to it in any Missouri cases.

all four elements of this standard. While we do not disagree with this contention, Leslea fails to direct us to any Missouri cases recognizing or adopting the *de facto* or equitable parenting standard set forth by the Wisconsin court.[8]

▮ With regard to her argument that she stands *in loco parentis* to Michelle's child, C.E.W., and that Michelle is similarly situated as to Leslea's child, Z.A.W., Leslea asserts that Missouri has long recognized the doctrine of *in loco parentis*. She cites *St. Ferdinand Loretto Academy v. Bobb*, 52 Mo. 357 (1873), *Eickhoff v. Sedalia, Warsaw & Sw. Ry. Co.*, 106 Mo. App. 541, 80 S.W. 966 (1904), and *In re Stevens' Estate*, 116 S.W.2d 527 (Mo.App. E.D.1938), in support of her contention. She relies on the following statement, which appears almost *verbatim* in all three cases:

> There is no obligation on the part of a stepfather to provide for his stepchildren arising by virtue merely of his marriage with their mother. He may refuse to provide for them, and may not be compelled to do so. His liability or not in such case depends upon the relation he chooses to assume in reference

to them. If he holds them out to the world as members of his family, he stands in loco parentis and incurs the same liability with respect to them that he is under to his own children, and the presumption in such case is that they deal with each other as parent and child. This relation being established, the reciprocal rights, duties, and obligations pertaining to it arise between them the same as if he were their natural father.

*In re Stevens' Estate*, 116 S.W.2d at 531. From this premise, Leslea argues that she and Michelle stand *in loco parentis* to each other's biological child "because they jointly raised the children with each other's consent, and treated each child, and held each child out to the world, as the children of both of them." Consequently, she claims that she has standing to bring the action based on her *in loco parentis* relationship to C.E.W. We disagree.

The concept that a stepparent has no obligation to support his or her spouse's child by a prior relationship, but can choose to do so by the manner in which the stepchild is treated, as declared in the cited cases, has been displaced by statute in Missouri. Section 453.400.1 provides, in

---

8. We are unaware of any Missouri appellate court decision adopting the concept or theory of an "equitable parent." In *Cotton v. Wise*, 977 S.W.2d 263 (Mo. banc 1998), the Missouri Supreme Court briefly discussed the "equitable parent" theory. It noted that "[w]hile the phrase sounds like a doctrine, its meaning and application are not well fixed nor widely accepted. No reported Missouri case has adopted the theory." *Id.* at 264. The Eastern District of this Court similarly declared that "Missouri has not adopted the 'equitable parent' theory." *Jefferson v. Jefferson*, 137 S.W.3d 510, 513 (Mo.App. E.D.2004) (citing *Cotton*, 977 S.W.2d at 264). *Jefferson* went on to state that our Supreme Court refused "to recognize the 'equitable parent' theory in *Cotton*," and "our legislature has not chosen to enact legislation codifying this theory." *Jefferson*, 137 S.W.3d at 514. Nevertheless, Leslea asks us to adopt the equita-

ble parent theory here. While we do not read *Cotton* as "refusing" to adopt the equitable parent theory, as *Jefferson* suggests, but merely finding it unnecessary to do so in that case, we are still confronted with the fact that *Cotton* did not adopt the theory in a case where doing so would have permitted it to affirm the trial court's decision without need for reversal and remand. Moreover, we are not unmindful of the fact that *Jefferson* was authored by Judge Mary R. Russell, who is now a judge of the Missouri Supreme Court. Accordingly, even if we were inclined to accept Leslea's invitation, we would not feel entirely confident that our decision conforms with the most recent decisional authority of the Missouri Supreme Court. *See Schumann v. Missouri Highway & Transp. Comm'n*, 912 S.W.2d 548, 551 (Mo.App. W.D.1995); *Mo. Const. art. V, § 2* (1945).

pertinent part: "A stepparent shall support his or her stepchild to the same extent that a natural or adoptive parent is required to support his or her child so long as the stepchild is living in the same home as the stepparent." Section 453.400.4 goes on to declare that "[t]his section shall not be construed as granting to a stepparent any right to the care and custody of a stepchild." Moreover, the stepparent's obligation to support the stepchild terminates once the stepchild is no longer "living in the same home as the stepparent." § 453.400.1; *Stein v. Stein*, 831 S.W.2d 684, 689 (Mo.App. E.D.1992). Thus, even if we were to assume for the sake of argument that Leslea did stand *in loco parentis* to C.E.W. while Leslea and Michelle lived together, that status terminated when they separated and would deprive Leslea of standing to bring her action. Accordingly, Points III and IV are denied.

### 4. Equitable Estoppel

In Point V, Leslea claims that Michelle is equitably estopped from refuting the mother and child relationship between Leslea and C.E.W. because Michelle encouraged and fostered that relationship. In support, Leslea cites several cases that generally discuss the theory of equitable estoppel or equitable adoption. *See Doe v. O'Connell*, 146 S.W.3d 1 (Mo.App. E.D. 2004); *Stein*, 831 S.W.2d 684; *S.E.M. v. D.M.M.*, 664 S.W.2d 665 (Mo.App. E.D. 1984); *In re Estate of Van Cleave*, 610 S.W.2d 620 (Mo. banc 1981); and *Long v. Willey*, 391 S.W.2d 301 (Mo.1965).

None of the cited cases are helpful as none of them hold that equitable estoppel

may provide a party with standing to bring an action seeking declaration of maternity, custody, or support, nor has our independent research revealed any. To the extent they discuss estoppel at all, they discuss "estoppel theories." [9]

Equitable estoppel is defensive in nature. *See Black's Law Dictionary* 590 (8th ed.2004).[10] "The doctrine of equitable estoppel, also referred to as 'estoppel by conduct' or 'estoppel en pais,' is an affirmative defense." *Comens v. SSM St. Charles Clinic Med. Group, Inc.*, 258 S.W.3d 491, 496 (Mo.App. E.D.2008).

"[E]quitable estoppel requires more than proof of acceptance of benefits." In order for a party to prevail on a theory of equitable estoppel, he must prove every fact essential to create an estoppel by clear and satisfactory evidence. Specifically, "there must be a representation made by the party estopped and relied upon by another party who changes his position to his detriment." In other words, the representation made by the party estopped must be inconsistent with the claim afterwards asserted and sued upon, and another party must have relied upon the representation and been injured thereby. The representation may be manifested by affirmative conduct in the form of acts or words, or by silence amounting to concealment of material facts.

*Id.* at 496–97 (citations omitted).

In her brief, Leslea argues that she "has pled, and the facts will establish,

---

9. In this regard, we note that Leslea relies exclusively on equitable estoppel and makes no claim that she has standing and states a cause of action based on promissory estoppel.

10. *"Equitable estoppel 1.* A *defensive doctrine* preventing one party from taking unfair advantage of another when, through false language or conduct, the person to be estopped has induced another person to act in a certain way, with the result that the other person has been injured in some way. This doctrine is founded on principles of fraud." *Black's Law Dictionary* 590 (8th ed.2004) (emphasis in text added).

all of the elements necessary to find that Michelle is estopped from denying both Leslea's parental relationship with C.E.W. and Michelle's own parental relationship with Z.A.W." She concludes this point in her brief by asserting "that the facts in this case warrant estopping Michelle from disputing the mother and child relationships that Michelle herself fostered between Leslea and C.E.W. and herself and Z.A.W." The problem with Leslea's argument, however, is that she fails to properly plead any legal basis under Missouri law for establishing her parental relationship with C.E.W. and Michelle's parental relationship with Z.A.W.

Michelle did not file an answer to Leslea's petition. Rather, she filed a motion to dismiss testing the adequacy of Leslea's petition. As a result, for purposes of ruling on the motion to dismiss, the court assumes all of Leslea's "averments are true and liberally grant[s] her all reasonable inferences therefrom." *Jefferson v. Jefferson*, 137 S.W.3d 510, 513 (Mo.App. E.D.2004). In effect, Michelle has demurred or replied "so what" to Leslea's petition, asserting that even if every allegation contained in the petition is treated as true, the petition fails to state any recognized claim upon which relief could be granted, as a matter of law. In other words, Michelle didn't deny anything that Leslea alleged; to the contrary, Michelle, in effect, said that none of the conduct alleged in the petition as pled and argued by Leslea created any legally recognized cause of action, either at the time of the alleged conduct or when Leslea filed her petition. It is not an equitable estoppel issue, but rather Leslea's inability to articulate a recognized legal basis in the posture of this case for her action. Therefore, equitable estoppel cannot be a basis for standing or affirmative relief under the existing pleadings of this case.[11] Point V is denied.

## V. Exceptional Circumstances

 Leslea next argues that "Missouri courts long have recognized that under the common law, 'exceptional circumstances' may warrant a grant of custody or visitation to a third party even where the biological parent is not unfit." She cites *In the Interest of K.K.M.*, 647 S.W.2d 886 (Mo.App. E.D.1983), *Flathers v. Flathers*, 948 S.W.2d 463 (Mo.App. W.D.1997), *Jones v. Jones*, 10 S.W.3d 528 (Mo.App. W.D. 1999), *Young v. Young*, 14 S.W.3d 261 (Mo.App. W.D.2000), and *Scott v. Scott*, 147 S.W.3d 887 (Mo.App. W.D.2004), in support of that contention. We do not disagree with Leslea's assertion or that the cited cases generally support that proposition.

 "The polestar guiding the resolution of custody disputes is the best interests of the child." *K.K.M.*, 647 S.W.2d at 892. " 'The law presumes that the best interests of the minor children are best served by the vesting of custody in the parent.' " *Id.* at 889 (quoting *M.P.M. v. Williams*, 611 S.W.2d 274, 277 (Mo.App. E.D.1980)). "The natural parent has a superior right to custody of the child as opposed to the interests of third parties." *Id.* In the dissolution context,

---

11. Foreign cases applying equitable estoppel are procedurally dissimilar to the instant action in that the non-biological partner in those cases first filed an action for custody and visitation, which was granted, and subsequently then denied liability for support. In those cases, the courts have held that the partner denying the liability for support was estopped by the prior claims of entitlement to custody and visitation. *See Chambers v. Chambers*, No. CN99–09493, 2005 WL 645220 at *7 (Del.Fam.Ct. Jan.12, 2005); *L.S.K. v. H.A.N.*, 813 A.2d 872, 877–78 (Pa.Super.Ct.2002).

§ 452.375.5 [12] "has been interpreted as establishing a 'rebuttable presumption that parents are fit, suitable, and able custodians of their children and that their welfare is best served by awarding their custody to their parents.'" *Scott*, 147 S.W.3d at 894 (quoting *Flathers*, 948 S.W.2d at 466). Under both the common law and § 452.375.5, the parental presumption can be rebutted even though the parent or parents are found to be fit and competent, upon a showing "that the welfare of the children, due to special or extraordinary circumstances, renders it in their best interests that their custody be granted to a third person." *Flathers*, 948 S.W.2d at 469; *see also, In re K.K.M.*, 647 S.W.2d at 890 ("This court holds that the presumption which favors vesting of custody in the natural parent must fall whenever the best interests of the child, for some special or extraordinary reason or circumstance, mandate that custody be vested in third persons, regardless of whether the evidence establishes the unfitness or incompetence of the natural parent.").

The fact that Missouri statutes and case law permit an award of custody to third parties where there are special or extraordinary reasons or circumstances rendering such custody to be in the best interests of the children, even when the parents are deemed fit and competent, does not end the analysis in this case. Neither our statutes nor our case law remotely suggest that any third party that comes along has standing to bring an action seeking custody of children.

Leslea has not cited, nor has our independent research revealed, any case involving third party custody that did not involve intervention in pending litigation by third parties or the third parties being named as parties in the initial custody case. For example, in *In re K.K.M.*, the mother brought a habeas corpus action against the paternal grandparents who had actual custody of the petitioner mother's daughter. 647 S.W.2d at 888. *Flathers* and *Young* were dissolution actions where grandparents were permitted to intervene to seek custody. *Flathers*, 948 S.W.2d at 465; *Young*, 14 S.W.3d at 263. *Scott* was also a dissolution action, in which the mother filed the petition naming not only the father, but also mother's former lover, Janice Kite, who had actual custody of the mother and father's minor child for more than three years, as respondents. *Scott*, 147 S.W.3d at 890–91. Finally, *Jones* was a motion to modify a dissolution decree filed by the father, where the grandmother was permitted to intervene to seek custody. *Jones*, 10 S.W.3d at 531; *see also In the Interest of Hill*, 937 S.W.2d 384, 385–86 (Mo.App. W.D.1997) (Juvenile Division placed child in maternal uncle and aunt's custody shortly after birth, father was identified by blood tests two years after child's birth and was made a party to proceedings, and court continued uncle and aunt's custody finding "special or extraordinary reasons."); *In re Marriage of Carter*, 794 S.W.2d 321, 321–24 (Mo.App. S.D. 1990) (Dissolution action in which court placed custody of children with maternal

12. Section 452.375.5 provides, in pertinent part:

5. Prior to awarding the appropriate custody arrangement in the best interest of the child, the court shall consider each of the following as follows:
* * *
(5) Third party custody or visitation:

(a) When the court finds that each parent is unfit, unsuitable, or unable to be a custodian, or the welfare of the child requires, and it is in the best interests of the child then custody, temporary custody or visitation may be awarded to any other person or persons deemed by the court to be suitable and able to provide an adequate and stable environment for the child.

grandmother and father later sought modification, and the court found grandmother to be a party respondent pursuant to her actual custody); *In re Feemster*, 751 S.W.2d 772, 772 (Mo.App. S.D.1988) (Natural mother filed habeas corpus action against minor child's grandfather and grandfather's wife alleging that grandfather and his wife were restraining child's liberty); *C.M.W. v. C.W.*, 786 S.W.2d 623, 623 (Mo.App. S.D.1990) (Mother filed habeas corpus petition seeking custody of her son against mother's parents).

As early as *Warman v. Warman*, 496 S.W.2d 286 (Mo.App. W.D.1973), this court recognized that a third party's standing to litigate custody or visitation was limited. In that case, husband and wife married and had one child. *Id.* at 287. They were divorced in 1967, and wife was awarded custody of the child. *Id.* Soon thereafter, she moved to Florida, and within a few weeks, husband and his parents went to Florida and returned the child to Missouri. *Id.* Husband then filed a motion to modify the original decree, and the court sustained the motion, but placed the child in the custody of the paternal grandparents and ordered husband to pay child support. *Id.* Sometime later, Husband remarried and thereafter filed a motion against his parents seeking modification of the custody decree. *Id.* The motion was granted, and the paternal grandparents appealed, arguing, *inter alia*, that they should have been awarded visitation. *Id.*

On appeal, the court first noted that the issue of the grandparents' standing to litigate denial of visitation was a jurisdictional matter to be examined by the court *sua sponte. Id.* at 288. For purposes of this discussion, the court defined applicable terms as follows:

The term 'actual custody', sometimes expressed de facto, is often used as the alternative to legal custody as describing the status of one who has decretal rights to custody. Obviously, one may have legal and not actual custody or one may have both. The term 'actual custody', unless qualified by some expression so denoting does not exclude 'legal custody' concurrent with such actual custody. The expression 'de facto custody' more nearly expressing the concept of physical custody unsupported by any order or decree will be utilized hereafter to indicate that status.

*Id.* at 288. After reviewing relevant case law, the court then stated:

It seems apparent that a distinction is to be made between third parties who have de facto custody which is unsupported by any court order setting and defining such custody and those third parties who have custody by virtue of a court order and, thus, legal custody. In the case of de facto custody, the remedy of a parent seeking to regain custody from such de facto custodian is habeas corpus. Where third parties have legal custody by virtue of a decree, the habeas corpus action is inappropriate and the action should be a motion to modify under the continuing jurisdiction of the trial court. Thus, *although grandparents, or other third parties have no standing to litigate either custody or visitation where they claim such standing on the basis of actual custody unsupported by any decretal rights, trial courts nonetheless have authority to place children with third parties when the natural custodians, the parents, are unfit or unable to undertake that custody.* When so decreed, the third parties become the legal custodians. When such third parties have become custodians by virtue of such an order, then they are frequently placed in the position of defending the order on subsequent motions to modify filed by one or the other of the natural

parents. To assert that they have no right to litigate the future status of the child would render nugatory the order granting custody.

*Id.* at 289 (citations omitted; emphasis added).

*In re Marriage of Carter* relied on *Warman* in reaching a similar result. 794 S.W.2d at 321–23. Without citation to *Warman* or *Carter,* this court likewise reached the same result in *McCoy v. Rivera,* 926 S.W.2d 78 (Mo.App. W.D.1996). In that case, Rivera placed her infant daughter, born January 7, 1988, in the temporary care of her father, Gary McCoy, and his live-in girlfriend, Daylene Bartell, in late 1988 when Rivera began serving a prison sentence. *Id.* at 79. No formal guardianship proceeding was initiated. *Id.* Rivera was released from prison in July, 1992, and that same month, McCoy and Bartell filed a petition in circuit court seeking custody of the child. *Id.* After numerous procedural hurdles, the court entered a final judgment on December 30, 1994, finding that the child should be reunited with Rivera, but the transfer should be delayed until August 1999, with increasing visitation between the child and Rivera during the interim. *Id.* at 80.

On appeal, Rivera argued that the trial court lacked jurisdiction, and this court agreed. *Id.* We noted that child custody can be "adjudicated in at least four types of actions: dissolution, *habeas corpus,* juvenile, and guardianship." *Id.* McCoy and Bartell conceded that the case was not a dissolution proceeding and that they were not seeking an adoption or guardianship. *Id.* They likewise conceded that their petition did not seek *habeas corpus,* but suggested that the court "treat their case as a *habeas corpus* case because it 'most resembles' one." *Id.* This court rejected this contention:

Habeas corpus is appropriate only in cases where a party is claiming that a person is being illegally or wrongfully restrained. The law, however, does not authorize an individual who has no previously existing legal right to custody of the child to bring an action in habeas corpus for custody. The person bringing an action in habeas corpus must stand in the position of a parent, guardian or someone entitled to custody because of some court order or judgment.

*Id.* at 81. We concluded that McCoy and Bartell had no right to bring the action in circuit court and, therefore, the court lacked subject matter jurisdiction, stating:

Although the child lived with McCoy and Bartell after 1988, they had no previously existing legal right to the child's custody. No court appointed them as legal guardians, and custody had not been adjudicated before the circuit court entered its order in January 1993. We find no basis which would have entitled McCoy and Bartell to bring a habeas action. We decline their invitation to treat this matter as one or any other type of action without establishing that they were entitled to bring their action and that the court had jurisdiction.

Before this action, no court had entered a custody order. Although the child has lived with McCoy and Bartell since 1988, they had no legal right, without a court order, to retain custody after Rivera was released from prison.

*Id.*

Relying on *McCoy,* the Southern District of this Court reached a similar result in *Chipman v. Counts,* 104 S.W.3d 441 (Mo.App. S.D.2003). In that case, Counts gave birth to a daughter out of wedlock in 1994. *Id.* at 442–43. For about six months after the birth, the child lived with Counts and the natural father. *Id.* at 443. For the next six years, until the time of

trial, the child lived with Count's mother, Karen Chipman. *Id.* In 2000, Chipman filed a petition for custody of the child. *Id.* After procedural matters, Chipman amended her petition, the case proceeded to trial, and in May 2002, the court entered judgment awarding custody to Chipman after finding extraordinary circumstances justifying the third party placement. *Id.* at 444.

On appeal, the court addressed the issue of standing. The court noted that "[t]o determine a party's standing is to 'ask[ ] whether the person[ ] seeking relief [has] a right to do so.'" *Id.* at 445 (quoting *Farmer*, 89 S.W.3d at 451). "If a court determines a party lacks standing, it 'must dismiss the case because it does not have jurisdiction of the substantive issues presented.'" *Id.* (quoting *Farmer*, 89 S.W.3d at 451). As in *McCoy*, the court found that Chipman's petition did not assert any recognized cause of action that she had standing to bring and, therefore, the court lacked jurisdiction to decide the case. *Id.* at 448.

We note that the case law is consistent with statutory provisions relating to grandparents and third parties in dissolution proceedings. Section 452.402.1(1) permits grandparents to intervene "in any dissolution action solely on the issue of visitation rights," or they may file a motion to modify where they have been denied visitation rights. Similarly, third parties generally may be awarded custody or visitation pursuant to § 452.375.5(5). Section 452.375.5(5)(b) specifically states that "[u]nder the provisions of this subsection, any person may petition the court to intervene as a party in interest at any time as provided by supreme court rule." And § 452.375.5(5)(a) specifies that "[b]efore the court awards custody, temporary custody or visitation to a third person under this subdivision, the court shall make that person a party to the action."

Accordingly, at least since 1973, Missouri courts have recognized that a third party's foundational standing to litigate custody or visitation is dependent upon the third party being a named party in an action brought by someone else (parent, Juvenile Officer) or being permitted to intervene in a pending action (dissolution) or in cases where the third party already has something other than *de facto* custody (decretal custody).

Applying these principles to the instant appeal, we note that in Count II, Leslea prayed that the trial court award both she and Michelle visitation or periods of temporary custody with the child of the other. From the foregoing, it is apparent that the only potential basis for awarding such visitation or custody would be under the exceptional circumstances doctrine. As noted, supra, there are limited circumstances under which a third party has foundational standing to litigate custody or visitation under the exceptional circumstances doctrine, and one of those is where the third party is a named party in an action brought by someone else, or a respondent to a counter or cross claim. Leslea did not have standing under the exceptional circumstances doctrine to initiate an action seeking custody or visitation when she filed her petition or at the time Michelle filed her motion to dismiss. Therefore the circuit court properly dismissed Count II based upon the pleadings before it at the time. *Home Builders Ass'n of Greater St. Louis, Inc. v. City of Wildwood*, 32 S.W.3d 612, 614 (Mo.App. E.D.2000) ("We consider the petition, along with any other noncontested facts accepted as true by the parties at the time the motion to dismiss was argued."). Because the dismissal was for lack of standing and without prejudice,

future litigation on these issues is not foreclosed if warranted by future pleadings.

## VI. Contractual Assumption of Child Support

 We next address Leslea's Point VII, where she generally asserts a claim for child support based on an express contractual assumption by her and Michelle of a continuing obligation of support for the biological child of the other. She contends that her petition stated a claim for relief based on contract principles and that Missouri courts have recognized such a claim for relief in prior cases. She relies primarily on *L. v. L.*, 497 S.W.2d 840 (Mo. App. W.D.1973), *S.E.M. v. D.M.M.*, 664 S.W.2d 665 (Mo.App. E.D.1984), and *Stein v. Stein*, 831 S.W.2d 684 (Mo.App. E.D. 1992). While these cases generally stand for the proposition that a third party who has no biological or adoptive relationship to a child can enter into an express contract with a biological parent to provide on-going support for the parent's child, and that such agreements are enforceable,[13] Leslea's petition fails to state a claim for such relief, and she failed to

13. In *L. v. L.*, Husband was in the Navy stationed in California in 1968 when he met Wife. 497 S.W.2d at 840. At the time they met, Wife was visibly pregnant by another man. *Id.* Nevertheless, Husband and Wife were married within a week of their first meeting. *Id.* The court described the facts surrounding the marriage as follows:

> The husband was fully aware of that state of pregnancy, and this was a matter of discussion between them. When the husband proposed marriage, the wife brought up the question very pointedly, the discussion between the parties according to her testimony being as follows: 'I said, 'Well, if we get married, I don't want you to—throwing that up to me that she doesn't belong to you.' He said, no, he wouldn't do that because since she wasn't born yet, it wouldn't make any difference, because if it had been a few months sooner, it could have been ours, you know.' The wife further testified that the husband at that time promised that 'he would recognize the child as his' and he further said both before and after the marriage that 'he would treat the child as his'. The husband admitted in his testimony that he made this promise both before and after the marriage.
>
> The child was born July 16, 1968. Pursuant to prior conversations between the parties, the child was given the husband's name and the husband was shown as the father on the birth certificate. The husband knew that this would be done, he made no objection, and indeed, after the birth he introduced the child to others as his daughter.

*Id.* at 840–41. The Husband was released from the service in 1970, and the couple and child moved to Missouri. *Id.* at 841. Within a short time, they separated, and Wife filed for divorce. *Id.* The trial court, in addition to granting the divorce, awarded custody of the child to Wife and ordered Husband to pay Wife child support. *Id.* at 840.

On appeal, Husband argued that he should not be obligated to pay child support since he was not the father of the child. *Id.* The court recognized the issue as one of first impression in Missouri and examined a number of cases from foreign jurisdictions. *Id.* at 841. The court noted that there was a split in the decisions but stated:

> A particularly careful study of this subject was made by a California court in *Clevenger v. Clevenger*, 189 Cal.App.2d 658, 11 Cal. Rptr. 707 (1961), reaching an attractive intermediate position. The court started with what may be called a general rule that a husband does not assume a continuing and irrevocable obligation to support another man's child merely by entering into marriage with the mother. While the husband by the marriage does step into 'the relation of step-father to the child and therefore becomes liable for his support,' that obligation is only concurrent with the life of the relationship, and 'the obligation assumed by a step-parent to support a step-child is not a continuing one, but may be abandoned at any time * * * and ordinarily ceases with the divorce of the step-parent * * * '. The court, however, went on to outline certain exceptions under which the husband may become bound beyond that limited liability. One of those exceptions is an express contractual assumption by the husband of a continuing obligation to support.

preserve any argument on the issue for appeal.

Leslea did not expressly denominate any count of her petition as seeking relief for breach of a contract for support. While individual allegations of her petition could be cobbled together to arguably state a claim under the express contract doctrine, the fact that she was asserting such a claim would not be immediately evident to a reader of her petition. Liberally construing the petition, Leslea alleged that, prior to the birth of C.E.W. and Z.A.W., she and Michelle agreed that they jointly would raise and support any children that either of them had during their relationship. She further alleged that the agreement continued through the birth of C.E.W. to Michelle and the birth of Z.A.W. to Leslea. The petition further claimed that about six months after Leslea and Michelle separated, Michelle unilaterally denied Leslea any contact with C.E.W. and discontinued her contact with Z.A.W. Michelle likewise rejected Leslea's efforts to provide financial support to C.E.W.

■■■ "To state a claim for breach of contract, a plaintiff must allege (1) the existence of a contract or agreement and the terms of that agreement; (2) that plaintiff performed or tendered performance; (3) that defendant did not perform; and (4) that defendant's failure to perform caused plaintiff damage." *Venable v. Hickerson, Phelps, Kirtley & Assocs., Inc.*, 903 S.W.2d 659, 664 (Mo.App. W.D.1995). Even assuming that the allegations in the petition are sufficient to allege that Michelle entered into a contract with Leslea to provide on-going support for Z.A.W., they still fail to state the length of time for such support to continue or that Michelle has failed to provide the financial support required by the agreement. Leslea was required to plead each and every element of her claim for relief. *Doyle v. Crane*, 200 S.W.3d 581, 590 (Mo.App. W.D.2006). Leslea's petition failed to so.

Moreover, despite her copious briefing and argument in opposition to Michelle's motion to dismiss in the trial court, Leslea never explicitly invoked the express contract theory as a basis to sustain her claim for child support. In particular, Leslea, while citing relevant cases, did so only for a separate legal principle, *not* for their recognition of the express contract theory.

In these circumstances, we will not reverse the trial court's dismissal of the petition, particularly where the trial court's dismissal was entered without prejudice.

## VII. Constitutional Claims

■■■ In her final three points, Leslea argues that the trial court's dismissal of her petition violated her rights under

*Id.* The court adopted this analysis and found that the Husband had entered "into an express agreement to support the unborn child." *Id.* at 842. The court then stated:
> Before agreeing to enter into marriage the wife asked for and received an express assurance that the husband would not later reject the child. The husband's response was that he would recognize the child and treat it as his own. This necessarily meant that he agreed to the same full incidents of child support as if he were the biological father.

*Id.* Accordingly, the court affirmed the trial court's award of child support.

The express contract approach applied in *L. v. L.* was recognized as a viable theory in later cases, although not applied because of the peculiar facts of those cases. *See S.E.M. v. D.M.M.*, 664 S.W.2d 665, 667 (Mo.App. E.D. 1984); *Stein v. Stein*, 831 S.W.2d 684, 688 (Mo.App. E.D.1992); and *Jefferson v. Jefferson*, 137 S.W.3d 510 (Mo.App. E.D.2004). The same approach is utilized in other jurisdictions and most notably, was applied by the Illinois Supreme Court in a recent case involving artificial insemination by an anonymous sperm donor in *In re Parentage of M.J.*, 203 Ill.2d 526, 272 Ill.Dec. 329, 787 N.E.2d 144 (2003).

the state and federal constitutions. Before we address these arguments, we must first determine whether such review is proper. "Pursuant to article V, section 3 of the Missouri Constitution, the Missouri Supreme Court has exclusive jurisdiction in cases involving the validity of a statute." *Ahern v. P & H, LLC,* 254 S.W.3d 129, 134 (Mo.App. E.D.2008). "However, a party's mere assertion of unconstitutionality does not deprive this Court of jurisdiction." *Id.* "When a party's claim is not real and substantial, but, instead, merely colorable, our review is proper." *Id.* "In determining whether a constitutional claim is real and substantial or merely colorable, this Court makes a preliminary inquiry as to whether it presents a contested matter of right that involves fair doubt and reasonable room for disagreement." *Mo. Highway & Transp. Comm'n v. Merritt,* 204 S.W.3d 278, 285 (Mo.App. E.D.2006). "If this initial inquiry shows that the claim is so legally or factually insubstantial as to be plainly without merit, the claim may be deemed merely colorable." *Id.* Here, Leslea's constitutional claims are merely colorable.

▮▮▮▮ In Point VIII, Leslea argues that she was deprived of due process because the court dismissed her petition at the outset of the action without giving her an opportunity to demonstrate "parent-child relationships" that warrant protection under Missouri law. Her constitutional complaint is that she was denied procedural due process rights, as opposed to substantive due process. Procedural due process requires that one "must receive notice and an opportunity for a hearing appropriate to the nature of the case." *Moore v. Bd. of Educ. of Fulton Pub. School No. 58,* 836 S.W.2d 943, 947 (Mo. banc 1992). "Due process contemplates the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.*

There were multiple hearings on Michelle's motion to dismiss in the trial court, during which Leslea was given every opportunity to present all her arguments as to why she had standing to bring the action, as well as how and why her petition stated claims upon which relief could be granted.

> A motion to dismiss for failure to state a cause of action is solely a test of the adequacy of the plaintiff's petition. It assumes that all of plaintiff's averments are true, and liberally grants to plaintiff all reasonable inferences therefrom. No attempt is made to weigh any facts alleged as to whether they are credible or persuasive. Instead, the petition is reviewed in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case.

*Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 306 (Mo.App. W.D.1993). After the trial court's hearings on the motion to dismiss, the trial court found that Leslea either (a) lacked standing to prosecute the claims she asserted, (b) failed to state claims upon which relief could be granted, or (c) failed to state claims that might be adopted in the case. Leslea has appealed that decision and has strenuously argued her positions in this court. We have already found that she failed to properly plead certain causes of action that were available to her, that she lacked standing as to other recognized causes of action based on the posture of this case, and otherwise failed to demonstrate any other recognized causes of action or claims that might be adopted in the case. Under these circumstances, it can hardly be said that Leslea has been denied procedural due process, and therefore, her claim is merely colorable. Point denied.

Leslie asserts in Point IX that the dismissal of her petition was a violation of her right to equal protection because she and the children were deprived of family protection and support on the basis of legitimacy, sexual orientation, and/or sex. This claim is likewise merely colorable. It has no merit because the denial of standing, or the failure of alleged claims because they do not state a claim upon which relief can be granted, is not based on legitimacy, sexual orientation, and/or sex, all as pointed out in some considerable detail, *supra.* Moreover, this is not a case in which the individual asserting parental rights currently has custody of the child or the child has never known its natural parent. *Cf. Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 843–44, 97 S.Ct. 2094, 2109–2110, 53 L.Ed.2d 14 (1977) (stating that "biological relationships are not exclusive determination of the existence of a family" and that "[a]t least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents," there could be a family relationship). Point denied.

In her final point, Leslie contends that the dismissal of her petition violated Missouri's open courts guarantee by denying her and the children the opportunity to seek legal protection of their family relationships. The "open courts" provision of the Missouri constitution, Article I, Section 14, "permits the pursuit in Missouri courts of causes of action recognized in substantive law" and "applies only to judicial or legislative acts that impose *procedural* bars to access to Missouri courts." *Merritt,* 204 S.W.3d at 285 (citing *Kilmer v. Mun,* 17 S.W.3d 545, 549 (Mo. banc 2000), and *Wheeler v. Briggs,* 941 S.W.2d 512, 514 (Mo. banc 1997)). "The open-courts provision was not designed to create rights, but only to allow a person claiming those rights access to the courts when such a person has a legitimate claim recognized by the law." *Etling v. Westport Heating & Cooling Servs., Inc.,* 92 S.W.3d 771, 774 (Mo. banc 2003) (internal quotation omitted). "An open courts violation is established upon a showing that: (1) a party has a recognized cause of action; (2) that the cause of action is being restricted; and (3) the restriction is arbitrary or unreasonable." *Snodgras v. Martin & Bayley, Inc.,* 204 S.W.3d 638, 640 (Mo. banc 2006). Leslea's arguments do not assert such a violation, and therefore, the claim is only colorable. The Point is denied.

## CONCLUSION

For all of the foregoing reasons, the trial court's judgment is affirmed.

HOWARD, J., concurs.

AHUJA, J., concurs in part and dissents in part in separate opinion filed.

ALOK AHUJA, Judge, Opinion concurring in part and dissenting in part.

I concur in the majority's disposition of Appellant Leslea Diane White's Points I through IV, VI, and VII. I respectfully dissent from the majority's disposition of Point V, however, because I believe that Leslea pled a viable equitable estoppel claim as a basis for seeking financial support for her son Z.A.W. I would accordingly reverse the dismissal of Leslea's equitable estoppel claim and remand for further proceedings. Given that disposition, and the prospect that Leslea could achieve some measure of relief on remand, I believe it is unnecessary to address Leslea's constitutional claims (Points VIII through X), and would dismiss them as moot.

Leslea cites *Stein v. Stein,* 831 S.W.2d 684 (Mo.App. E.D.1992), and *S.E.M. v.*

*D.M.M.*, 664 S.W.2d 665 (Mo.App. E.D. 1984), in support of her estoppel argument. Both cases hold that "our courts have recognized two situations where a non-biological or non-adoptive parent is obligated to support a spouse's child after dissolution"; besides express contractual assumption, support obligations may also be imposed "based on an estoppel theory." *Stein*, 831 S.W.2d at 688; *see also S.E.M.*, 664 S.W.2d at 667–68. Other cases similarly recognize the availability of an estoppel theory to impose a financial support obligation on a third party who is neither biologically related to a child, nor has assumed obligations to the child by formal adoption. *See Jefferson v. Jefferson*, 137 S.W.3d 510, 515 (Mo.App. E.D.2004); *L. v. L.*, 497 S.W.2d 840, 841–42 (Mo.App.1973).

At oral argument, counsel for Respondent Elizabeth Michelle White acknowledged that recognizing an estoppel claim for financial support was consistent with *Jefferson* and with *Cotton v. Wise*, 977 S.W.2d 263 (Mo. banc 1998). She argued, instead, that the doctrine should not be applied here because each party was capable of supporting her own child. Counsel admitted, however, that this issue could not be decided based on the allegations of Leslea's petition, even if it were otherwise relevant. Michelle also argued below, and in this Court, that Leslea cannot assert an estoppel claim "when she otherwise has no statutorily authorized standing." Michelle cites no legal authority for this argument, and I am unaware of any legal doctrine which requires a litigant to have "statutorily authorized standing" before asserting a

common-law claim like the estoppel claim Leslea seeks to assert here.[1]

The majority rejects Leslea's estoppel claim based in large part on the observation that "[e]quitable estoppel is defensive in nature," Op. at 16; the majority suggests that the result may have been different if Leslea had invoked *promissory* estoppel instead. *Id.* at 16 n. 9. I respectfully disagree with the majority's reliance on such fine distinctions to deny Leslea relief. In the trial court and here, Leslea cited and relied upon *Stein* and *S.E.M.*, both of which recognize that an "estoppel exception" exists to the general rule of third party non-liability for support. *S.E.M.*, 664 S.W.2d at 667; *see also Stein*, 831 S.W.2d at 688 (referring to exception based on "an estoppel theory"). While *S.E.M.* refers to this theory as involving the "promissory estoppel doctrine," 664 S.W.2d at 668, *Stein* refers to the doctrine simply as "estoppel." The later decision in *Jefferson* itself refers to the doctrine as "equitable estoppel"; although it recognizes that *S.E.M.* relied on promissory estoppel principles, *Jefferson* observes that "the [promissory estoppel] rule [of *S.E.M.*] and its exceptions have been applied when dealing with *equitable* estoppel." 137 S.W.3d at 516 n. 3 (citing *Stein*). Moreover, decisions outside this specific context recognize that "[p]romissory estoppel"— the doctrine the majority suggests Leslea *should have* invoked—"is simply one type of equitable estoppel," and that "equitable estoppel" is a broad category "which encompasses all estoppels arising out of some

---

1. *S.E.M.* observes that "one estoppel exception concerns assertions made by the husband to the child." 664 S.W.2d at 667. The estoppel doctrine is not solely available to the child, however: *Stein* "also consider[s] estoppel as to wife" (the biological mother), 831 S.W.2d at 689, and *In re Marriage of A.J.N. & J.M.N.*, 141 Wis.2d 99, 414 N.W.2d 68 (1987), cited favorably in *Jefferson*, 137 S.W.3d at 517, likewise recognizes that a mother may claim estoppel. 414 N.W.2d at 71. I fail to see any reason why a biological parent cannot assert an estoppel claim in her own right, where that parent alleges that she chose to conceive, give birth to, and retain custody of a child, with the attendant substantial and long-term financial obligations, in reliance on a third party's representations and conduct.

form of misrepresentation." *Resnik v. Blue Cross & Blue Shield of Mo.*, 912 S.W.2d 567, 572–73 (Mo.App. E.D.1995); *see also Savannah Place, Ltd. v. Heidelberg*, 122 S.W.3d 74, 81 (Mo.App. S.D. 2003); *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1061 (8th Cir.2005) (Missouri law).

In these circumstances, where Leslea cited relevant caselaw, and our decisions are less-than-precise in their use of estoppel nomenclature, I consider it inappropriate to reject Leslea's claim because she stated that she was invoking "equitable estoppel" principles.

Leslea's petition adequately pled an estoppel claim. The essential elements of promissory estoppel (which *Jefferson* equates to the "equitable estoppel" doctrine applicable here) are:

> "(1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure."

*Bauer Dev. LLC v. BOK Fin. Corp.*, 290 S.W.3d 96, 100 (Mo.App. W.D.2009) (quoting *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007)). As the majority recognizes, Op. at 15–16, the essence of an equitable estoppel claim is similar.

Here, Leslea alleged: that she and Michelle had an agreement, which continued throughout their relationship, "that they would jointly raise any children that they had as a result of their relationship"; that Leslea was impregnated in 2003 "in order for the couple to have a second child together"; that the parties shared the pregnancy-related costs; that—consistent with their earlier agreement—"Michelle shared in the parenting, and emotional and financial support of [Z.A.W.]" until approximately six months after the parties' separation; that in numerous respects the parties held Michelle out as Z.A.W.'s mother, both to him and to third parties; and that Z.A.W. is in need of Michelle's support. "[A]llowing [Leslea's allegations] their broadest intendment,"[2] "liberally grant[ing][her] all reasonable inferences therefrom,"[3] and given Michelle's failure to argue any defect in Leslea's allegations of estoppel either here or below, I conclude that her petition is sufficient to state a claim for child support based on the estoppel doctrine recognized in the cases discussed above.[4] While I believe Leslea's petition is minimally sufficient to invoke the estoppel doctrine recognized in prior cases, whether she could actually prove the necessary elements of an estoppel claim would of course depend on the evidence presented in any remand, and the factfinder's assessment of that evidence.

*Jefferson* expressed reluctance to employ an estoppel theory "to impose a child support obligation on a husband 'merely because [he] developed a close relationship with the child and nurtured them into a family unit while "acting" as the natural parent,'" based on its view that "'[v]oluntary support of nonmarital children or stepchildren should not be discouraged.'"

---

2. *Norber v. Marcotte*, 134 S.W.3d 651, 657 (Mo.App. E.D.2004).

3. *Richardson v. Richardson*, 218 S.W.3d 426, 428 (Mo. banc 2007) (internal quotation marks omitted).

4. For similar reasons I also conclude, contrary to the majority, that Leslea adequately pled a claim for child support for Z.A.W. based on the express contractual assumption doctrine. However, given her failure to argue that theory in the circuit court in response to Michelle's motion to dismiss, Leslea failed to preserve the express contractual assumption issue for our review, and I therefore concur in the majority's disposition of that claim.

137 S.W.3d at 517 (quoting *Marriage of A.J.N.*, 414 N.W.2d at 71). However in this case Leslea does not seek to impose support obligations on Michelle "merely" based on Michelle's close relationship with, and prior support of, Z.A.W. Instead, the critical aspect of Leslea's estoppel claim here is the contention, fairly comprehended by her pleading, that she voluntarily and intentionally became pregnant, carried Z.A.W. to term, and retained custody over him, in reliance on Michelle's undertakings. Recognizing Leslea's estoppel claim here seems to me fully consistent with Missouri cases which have recognized the availability of such a theory in similar circumstances, and with the general equitable estoppel principle that a person should not be permitted to make representations or promises on which they know or should know others will rely to their detriment, only to later attempt to escape those commitments scot-free.

While I concur in the lion's share of the majority's disposition, and the careful and well-reasoned opinion explaining the result, for the foregoing reasons I respectfully dissent from the majority's disposition of Appellant Leslea Diane White's estoppel claim seeking child support.