**Susan M. POTTS, Respondent,**

v.

**Raymond A. POTTS, II, Appellant.**

**Nos. WD 70196, WD 70455.**

Missouri Court of Appeals, Western District.

Feb. 23, 2010.

---

Michelle E. Jakobe, Lee's Summit, MO, for appellant.

Stanley Brian Cox, Sedalia, MO, for respondent.

Before LISA WHITE HARDWICK, P.J., JAMES M. SMART, JR., and ALOK AHUJA, JJ.

PER CURIAM:

Raymond Potts appeals the judgment of the Pettis County Circuit Court pertaining to the dissolution of his marriage to Susan Potts. He argues on appeal that the trial court erred with respect to awarding custody of the parties' children, finding the parties' prenuptial agreement to be unconscionable, classifying and dividing property, awarding maintenance, awarding child support, and ordering Raymond to pay Susan's attorneys' fees on appeal. The judgment is affirmed.

### Facts

Raymond and Susan Potts were married on September 21, 1985. They separated on July 16, 2006, with Susan subsequently filing a petition for dissolution of marriage. They have four children. The oldest child is emancipated.

Raymond has been engaged in business as a roofing sheet metal contractor since 1979. Raymond's business is incorporated as Potts Contracting Group, Inc. Raymond owns all the shares in his sole name. The record shows that Raymond has a track record of disregarding corporate formalities in transferring funds back and forth between his corporation and himself, and accordingly owes taxes to the government. At the time of the marriage, Susan was 30 years old and worked at a bank as a secretary for a loan officer. Susan had previously worked as a floral designer. At the time of the dissolution trial, Susan worked 30 hours per week for $7.00 per hour coordinating delivery meal service to the elderly at a senior center.

The parties signed a prenuptial agreement the day before their marriage. The prenuptial agreement contained a full disclosure of the parties' assets and debts at the time of the marriage. The parties disagreed about the details surrounding the execution of the agreement.

Raymond testified to the following particulars concerning the prenuptial agreement. He had the agreement drawn up by his attorney several months prior to the marriage. He gave the prenuptial agreement to Susan for her review about a month prior to the wedding. Susan requested that Raymond change the provisions of the prenuptial agreement and suggested a formula so that she would get more money for each year that the parties remained married. Raymond's secretary notarized the prenuptial agreement. He remembers it being signed in his office prior to the end of business on the Friday before the wedding.

Raymond's business attorney also testified. He said that he prepared the prenuptial agreement at Raymond's request. He said he would have talked generally with Raymond, as he did with all his business clients, about the need to prepare a prenuptial agreement not less than 60 days prior to the wedding. Raymond's attorney recalled meeting with Raymond on July 10, 1985, and located his datebook reflecting that appointment. He recalled Raymond contacting him about a change that Susan wanted based on a formula that would provide more money for each year they were married. This was a formula that the attorney did not regularly use. Raymond's attorney testified that, though he made changes in the prenuptial agreement, he did not make any changes to the agreement a day or two prior to the wedding. He recalled that Raymond spoke to him about changes Susan wanted made to the agreement prior to wedding invitations

being sent out. He recalled it because Raymond mentioned that he was not on the wedding invitation list. He did not testify that he was present when the agreement was signed, and he did not purport to know the date the agreement was signed.

Susan testified that she saw the prenuptial agreement for the first time on the Wednesday before the Saturday wedding. She said that although she did not read it completely, there was some language about receiving a certain amount of money in case of dissolution of marriage. Susan objected to some of what she read. Raymond agreed to have the agreement redone. Susan testified that she had never talked to Raymond's attorney and that she had not been in his office. She said that she received the revised agreement at 7:00 p.m. on the Friday night before the wedding, just as they were leaving for the rehearsal dinner. Susan said she read a little of the revised agreement. Susan testified that she did not sign the agreement in front of a notary public. She said that she had no legal training and, until recently, no one with legal training had explained to her the meaning of the agreement.

Both Raymond and Susan sought custody of the children. Raymond was romantically involved with another woman (Teresa) during his separation from Susan.

Raymond and Susan's children testified at the trial. Their 10–year–old son testified that he had stayed overnight with Raymond only twice in the previous six months. The son said this was less frequent than it had been because he did not like the fact that Teresa had started sleeping in Raymond's bed. Their 16–year–old son testified that he had never stayed overnight at Raymond's house because he did not "like it" at Raymond's house. He said that he did not like the "sleeping arrangements" at Raymond's house, and

that Teresa and Raymond shared a bed. Their 18–year–old son testified that he had never spent the night at Raymond's house because he was not comfortable there. Their 21–year–old son was estranged from Raymond. He testified that he and Raymond do not talk.

The parties also disagreed over Raymond's financial position. Raymond gave the following testimony. Raymond's business, Potts Contracting Group, Inc., has suffered financially since approximately 2003. The trouble began when there were two instances of material suppliers providing defective material to the business for use in large projects. The defects were not discovered until after installation, causing the owner to refuse payment. After the petition for dissolution of marriage was filed, Susan took the prenuptial agreement out of Raymond's office. She told Raymond that she destroyed it. In reality, Susan hid the prenuptial agreement in a safe-deposit box and then gave it to her divorce attorney. Raymond obtained the prenuptial agreement during a deposition and submitted it to the trial court. Raymond needed the prenuptial agreement in order to obtain the commercial bonds that would enable his business to bid on large jobs. Without the prenuptial agreement, Raymond was unable to secure the needed bonds, and the business declined further. Raymond says his business corporation is deeply in debt and has not made a profit for several years. Raymond did not provide documentation supporting these assertions. Raymond offered some purported expert testimony by way of an accountant, but the court found that a lack of foundation was shown for the accountant's opinion. During the separation and pendency of the divorce, Raymond says he borrowed approximately $9,000 per month from the business to pay

to Susan, and then $900 per week to pay temporary support.

The U.S. Individual Tax Return filed by the parties in 2005 included $98,500 in wages and $66,626 in rental real estate income plus additional sums for capital gains. Their 2006 U.S. Individual Tax Return included wages of $52,000 and $70,055 in rental real estate income.

The trial court determined that the asset known as Potts Contracting Group was nonmarital property. According to the prenuptial agreement, this asset was worth $627,373.57 at the time of the marriage. The trial court found that Raymond had received annually an average of $80,000 in salary, $44,000 in rent income, and $100,000 in other company withdrawals (presumably designed as tax-deferred withdrawals). The trial court found that Raymond had received roughly $12,000 per month in income. The court found no credible, documented evidence from which to conclude that his income pattern would not continue in the long term.

The trial court's judgment awarded Raymond and Susan joint legal custody of their unemancipated children; awarded Susan sole physical custody of their children and Raymond visitation; held the prenuptial agreement to be invalid; determined that all property was marital except for Raymond's ownership of the business and an outboard motor which was ruled to be Raymond's nonmarital property. The court determined that the profit from the real estate that was sold was a marital asset, and awarded it to Raymond along with the business. The court awarded Susan $237,931 in marital assets, but the court also granted Raymond an equalizing money judgment against Susan in the amount of $158,436, payable at the rate of $500 per month. Raymond was assigned responsibility for $107,000 in debts. Child support was ordered at $1,180 per month.

The court ordered Raymond to pay Susan $2,500 per month as maintenance. The court awarded Susan $22,000 in attorneys' fees, while stating that the attorneys' fees were also a "division of property."

Raymond filed his notice of appeal. Susan subsequently filed a motion for attorneys' fees and costs for appeal and requested that Raymond pay her attorneys' fees and costs on appeal. After hearing arguments on the motion, the trial court ordered Raymond to pay $5,000 for Susan's attorneys' fees and costs on appeal. Raymond's appeal of that ruling was consolidated with his other points.

## Standard of Review

"In a court-tried case, the decree of the trial court must be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Kester v. Kester*, 108 S.W.3d 213, 218 (Mo.App.2003). "[W]e review the evidence and inferences in the light most favorable to the trial court's decision and disregard all contrary evidence and inferences." *Id.* "Judging credibility and assigning weight to evidence and testimony are matters for the trial court, which is free to believe none, part, or all of the testimony of any witnesses." *Id.* "We presume that the trial court took into account all evidence and believed such testimony and evidence that is consistent with its judgment." *Id.* "The party challenging the trial court's judgment in a dissolution of marriage has the burden of demonstrating error." *Id.*

## Child Custody

Raymond claims that the trial court erred in awarding Susan sole physical custody of their minor children. He is not seeking a change in the amount of time awarded to each parent in the parenting

plan. Instead, he suggests that the trial court erred in designating Susan as having "sole physical custody" of the minor children rather than determining that both parties share joint physical custody, with Susan's address being designated for educational and mailing purposes. In essence, he complains about the label given to the custody arrangement.

During the school year, Raymond has the minor children every other weekend from Friday at 5:00 p.m. until Sunday at 7:00 p.m. and every Tuesday overnight. During the summer, Susan has the children every other weekend, every Wednesday overnight, and for two ten-day periods of vacation. The parties alternate holidays.

■■■ "Section 452.375.1(1) defines child 'custody' under Missouri law as 'joint legal custody, sole legal custody, joint physical custody or sole physical custody or any combination thereof.'" *Malawey v. Malawey*, 137 S.W.3d 518, 524 (Mo.App. 2004). "The designation of physical custody as joint physical custody, rather than sole or primary physical custody with visitation rights for the other parent, is significant in that it determines the standard for future modification of the physical custody arrangement." *Id.* "A visitation award can be modified whenever modification would serve the children's best interests." *Id.* (*citing* section 452.400.2). "Modification of a custody decree, however, requires the court to find that a change has occurred in the circumstances of the child or the custodian that necessitates modification to serve the children's best interests." *Id.* (*citing* section 452.410). "Further, designation as a joint physical custodian can have intrinsic value for a parent who believes a stigma attaches when the other parent is named the primary or sole custodian." *Id.*

■■■ "Section 452.375.1(3) defines 'joint physical custody' as 'an order award-ing each of the parents significant, but not necessarily equal, periods of time during which a child resides with or is under the care and supervision of each of the parents.'" *Id.* "Joint physical custody does not require the children spend equal amounts of time with each parent." *Id.* (*citing* section 452.375.1(3)). "The statute does not define 'sole physical custody.'" *Id.* "When the court orders significant periods where the child is in the care of each parent, the award is actually one of joint physical custody, regardless of how the court characterizes it." *Id.* "The key consideration in carrying out Missouri's public policy is the amount of time the children spend with each parent, not what the arrangement is called." *Id.* "We look to the amount of time for which each parent has the care and supervision of the children to determine the proper designation of the physical custody arrangement as 'joint' or 'sole.'" *Id.*

Susan notes that the temporary order provided significant overnight visitation. Raymond had not been exercising that visitation, however, because the children were not comfortable with Raymond's relationship with his girlfriend and did not want to spend the night with Raymond. Susan claims the designation of sole physical custody is a "reflection of the actual contact being exercised" between Raymond and his sons. Susan claims that the trial court set up the visitation schedule in an attempt to "make it better" and to encourage the children to spend more time with Raymond. She states: "The order of joint legal custody and sole physical custody with generous visitation … was both a determination of the reality of the relationship as existed between [Raymond] and his sons and an encouragement of an improved relationship fostered by frequent contact."

In any event, we wonder whether it really matters whether the court called it sole physical or joint physical custody. The Supreme Court in *Russell v. Russell*, 210 S.W.3d 191, 193–94 (Mo. banc 2007), traced the history of the requirement that a movant, in order to obtain a change in parenting time, show a substantial and continuing change of circumstances. In that case, the court granting the dissolution had awarded "joint legal and physical custody" to mother and father. *Id.* at 194. Mother then sought to modify the joint physical custody arrangement. *Id.* The court explained that to change an award from *joint* physical to *sole* physical custody, the movant would have to show both a change of circumstances and the "best interest" requirement under section 452.410. *Id.* But the change mother sought amounted to simply a change in parenting time. *Id.* And if the change desired is only a change in parenting time, the court need find only that the change would serve the best interests of the child. *Id.* at 196. Here, though Raymond may feel slighted by the designation as the non-custodian, he has already received an order for the parenting time he wants. The reality is that he is a "joint physical custodian," regardless of the lack of such a label. *See, e.g., In re Marriage of Parmenter*, 81 S.W.3d 234, 238 (Mo.App.2002) (parent awarded visitation the second full weekend and the last full week of each month, all of the time during the summer school vacation except for the second full weekend and the last full week during that time, and alternate birthdays and holidays was awarded joint custody); *In re Marriage of Johnson*, 865 S.W.2d 412, 414–15 (Mo.App.1993) (parent awarded visitation every weekend except every third weekend, commencing at 6:30 p.m. on Friday and ending at 6:30 p.m. on Sunday was awarded joint custody). The fact that Raymond's parenting time may not be fully utilized does not change the fact that the decree makes provision for what is, in effect, joint physical custody.

Where the only issue, in actuality, is a simple shift in parenting time, it is no longer "appropriate" to require a showing of a substantial change of circumstances. *Russell*, 210 S.W.3d at 197. Raymond is, for all practical purposes, a joint physical custodian. It is not necessary to find error or to remand for correction of the decree where we can simply recognize and clarify that he is a joint physical custodian. Rule 84.14

### Prenuptial Agreement

██ Moving on from that point, we encounter Raymond's claim that the trial court erred in ruling that the prenuptial agreement is unconscionable and unenforceable. He argues that the finding was not based on substantial evidence, went against the weight of the evidence, and misapplied the law. Raymond says the prenuptial agreement is valid because it was entered into freely, fairly, knowingly, and with full disclosure. He cites the following: Susan's requested changes were incorporated into the agreement; Susan was not an unwary or ill-informed spouse given that she was thirty years old and worked at a bank at the time of the marriage; all assets were fully disclosed in the agreement; the agreement was drafted in advance of the wedding by an attorney for Raymond; Susan had ample time to review the agreement; although she did not do so, Susan had the opportunity to have the agreement reviewed by an attorney of her choosing; no undue duress was placed on Susan to sign the agreement; the agreement allows for a mutual release of rights by allowing both parties to title assets separately during the marriage; and the agreement is not so one-sided as to render it unconscionable.

"[I]t is well-settled law that an antenuptial agreement contemplating the dissolution of a parties' marriage is not against public policy and can be valid." *In re Marriage of Thomas,* 199 S.W.3d 847, 852 (Mo.App.2006). In Missouri, "to be valid and enforceable an antenuptial agreement must be entered into freely, fairly, knowingly, understandingly, and in good faith with full disclosure." *Id.* "This requirement has been interpreted by the courts to involve a subjective evaluation of the fairness surrounding the execution of the agreement." *Id.* "Factors which courts have considered relevant include the signatories' access to independent counsel, the amount of time available to revise the agreement, the bargaining positions of each spouse in terms of age, sophistication, education, employment, and experience, and whether their assets were fully disclosed." *Id.* "The fairness of the agreement must be determined as of the date of the agreement." *Id.*

"[A]ntenuptial agreements will be upheld and will dispose of issues of property division unless found to be unconscionable." *Id.* "An agreement is unconscionable when the inequality is so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *Id.* "Conscionability ... mean[s] protection against onesidedness, oppression or unfair surprise." *Id.* Binding parties to the provisions of an antenuptial agreement only if the agreement was "conscionable and fairly made," provides protection to the unwary and ill-informed spouse. *Id.*

There are two aspects to unconscionability: procedural unconscionability and substantive unconscionability. *See Repair Masters Constr., Inc. v. Gary,* 277 S.W.3d 854, 857 (Mo.App.2009). "The former deals with the formalities of making the contract, while the latter deals with the terms of the contract itself." *Id.* "[P]rocedural unconscionability in general is involved with the contract formation process, and focuses on high pressure exerted on the parties, fine print of the contract, misrepresentation, or unequal bargaining position." *Woods v. QC Fin. Serv., Inc.,* 280 S.W.3d 90, 95 (Mo.App.2008). "Substantive unconscionability refers to an undue harshness in the contract terms." *Repair Masters Constr., Inc.,* 277 S.W.3d at 858. The courts look to both procedural and substantive unconscionability in determining whether a contract or a clause can be voided. *See Woods,* 280 S.W.3d at 95. It has been suggested that there should be a balancing between the substantive and procedural aspects and that if there exists "gross procedural unconscionability," then an agreement may be voided though there is not great substantive unconscionability. *Id.* It is also suggested "that the same sliding scale be applied if there be great substantive unconscionability but little procedural unconscionability." *Id.*

But it is also now clear that, even without any specific procedural unconscionability, a court can refuse to enforce a highly unconscionable (that is, *substantively* highly unconscionable) provision. *See, e.g., Vincent v. Schneider,* 194 S.W.3d 853, 858 (Mo. banc 2006). And here, in any event, the trial court considered issues of both procedural and substantive conscionability, with its main emphasis on the substantive terms of the agreement.

"At trial, the burden of proof on the issue of the validity of the antenuptial agreement rests with the party seeking to invalidate the agreement." *In re Marriage of Thomas,* 199 S.W.3d at 852. "The validity of an ante-nuptial agreement is governed by rules that are unique and are distinct from the requirements for the execution of an ordinary contract." *Id.*

This is particularly true in terms of consideration. *Id.* "An ante-nuptial agreement requires more consideration than that necessary for a simple contract, in that the consideration moving to the spouse or prospective spouse surrendering marital rights must be fair and equitable in the particular circumstances." *Id.*

"In situations where there is a[n] [antenuptial] agreement, the character of the property as community/marital or separate is not determined by the presumptions set forth by statute or case, but by the terms of the contract." *Id.* "By statute, 'marital property' in a dissolution proceeding does not include '[p]roperty excluded by valid written agreement of the parties.'" *Id.* at n. 2 (*quoting* section 452.330.2(4)). "An antenuptial agreement must ... be read as a whole in order to determine its purpose and meaning." *Id.* at 853.

Raymond and Susan were married on Saturday, September 21, 1985. There is no dispute that the prenuptial agreement was prepared by attorney Adam Fischer in advance of the wedding at Raymond's request. It contained a full disclosure of Raymond's assets. Susan at some point reviewed the agreement and requested changes be made. Adam Fischer made the changes. The record does not show when he made the changes. Fischer said that the changes were not made in the last day or two before the wedding. Susan said that the change would have been made some time between mid-week and Friday night. The agreement was signed on Friday, September 20, 1985. At the time of the marriage, Raymond's assets were significantly greater than Susan's assets. Raymond entered the marriage with $627,373.57 while Susan entered the marriage with $5,000.00.

The parties' testimony conflicted as to how the prenuptial agreement was prepared and signed. Raymond erroneously focuses on evidence that is contrary to the trial court's judgment, including his testimony and the testimony of Adam Fischer. The standard of review requires this court to disregard evidence and inferences contrary to the judgment. *Kester,* 108 S.W.3d at 218. "We presume that the trial court ... believed such testimony and evidence that is consistent with its judgment." *Id.*

Susan testified that she never met with Adam Fischer. She testified that she first received the prenuptial agreement to review on the Wednesday prior to the Saturday wedding. She was able to discuss the prenuptial agreement with a friend and to request that changes be made. Susan said the revised prenuptial agreement was presented to her for her signature at 7:00 p.m. on Friday night as the parties were about to leave for their wedding rehearsal. The wedding was planned for the next day. Susan believed that her only choice was to sign the agreement or suffer humiliation in front of her friends and family. She said that she did not sign the agreement in front of a notary public (even though the agreement is notarized). Susan never consulted an attorney about the agreement, perhaps in part because she was first presented with the agreement a few days before the wedding. Susan said she was in the midst of wedding preparations and lacked sufficient time to examine the agreement. She testified that she did not understand the document. The trial judge, of course, was not required to believe either Raymond's testimony or the testimony of Raymond's attorney that no changes were made in the last day or two before the wedding. Thus, there was some evidence which could support the conclusion that the agreement was procedurally unconscionable.

The prenuptial agreement does more than protect separate property existing at

the time of the marriage. It allows either party to acquire property subsequent to the marriage (from any source including Raymond's business) and protect it as separate property by simply titling and holding the newly acquired property in that party's sole name. For example, under the agreement as drafted, all earnings generated from Raymond's holdings, which would normally be considered marital property, could be shielded from becoming marital. Those earnings could be converted to Raymond's separate property merely by depositing such earnings in assets titled only to Raymond. The prenuptial agreement also does not address the matter of accrued debt. Thus, the agreement purports to leave Susan with equal responsibility for debt even though Raymond could receive a windfall in his freedom to designate what property becomes marital and what does not. Basically, the agreement gave Raymond a free hand to cut Susan out of a marital estate and to leave her with a formula distribution that was designed to be in lieu of maintenance.

Raymond points out that courts have upheld prenuptial agreements where one party's assets were significantly greater than the other spouse's assets at the time of execution. He also states that courts have upheld prenuptial agreements that were signed shortly before the wedding. Raymond argues that embarrassment does not rise to the level of duress. He also states that prenuptial agreements allowing parties to designate property as separate property have been upheld.

Raymond's arguments focus on each piece of evidence singularly instead of on the combined weight of all the evidence together. The trial court believed that Susan was given a short time to review the prenuptial agreement, which is part of procedural unconscionability. *See, e.g., McMullin v. McMullin,* 926 S.W.2d 108, 111 (Mo.App.1996) (an aspect of full disclosure involves whether a party was given enough time between the presentation of the final draft and the wedding to reasonably consider whether she should seek legal advice prior to signing); *In re Estate of Arbeitman,* 886 S.W.2d 644, 647 (Mo. App.1994) (arguing that the time frame between signing the prenuptial and the wedding was too short but not arguing that the short time frame resulted in a lack of understanding of the prenuptial agreement). While Susan was not uneducated, she denied understanding the terminology of the prenuptial agreement and its consequences. *Compare In re Marriage of Thomas,* 199 S.W.3d. at 858 (noting the distinction between not having available time to understand and revise a prenuptial agreement and understanding the terms of an agreement despite a short time frame); *Miles v. Werle,* 977 S.W.2d 297, 302 (Mo. App.1998) (holding that the parties' bargaining power was similar and the antenuptial agreement was not unconscionable where both parties had high school educations, *stated they understood the terms of the agreement,* and "each appended property list[s]" to the agreement even though husband had no assets); *In re Marriage of Thomas,* 199 S.W.3d. at 860 (stating: "On the contrary, the record is replete with instances in which Wife herself testified she had knowledge of the terms of the antenuptial agreement; she was represented by counsel; and she willingly signed the agreement.").

The trial court also presumably recognized that the agreement contained elements of *substantive* unconscionability. Raymond came into the marriage as the only one with *assets that would generate future assets.* As already mentioned, the agreement allowed him to categorize all assets generated in the future as separate property. *Compare King v. King,* 66

S.W.3d 28, 36 (Mo.App.2001) (holding antenuptial agreement was not unconscionable where although the agreement "provided that the separate property of the parties remain separate, and that provision did result in a great disparity between the separate property set aside to each spouse[,][t]he agreement … did not attempt to preclude an award of marital property to [w]ife"); *Miles,* 977 S.W.2d at 303–04 (holding antenuptial agreement was not unconscionable where husband "retained his rights to the accrual of marital property"; the agreement "did not seek to totally prevent [husband] from obtaining the marital assets which he would have obtained absent the agreement"; and where "the agreement basically provided only that what each spouse brought into the marriage as separate property would remain their own separate property"). "[U]nconscionability has been found where … the agreement attempts to totally take from one of the spouses his or her presumed right to marital property." *In re Marriage of Thomas,* 199 S.W.3d at 860. "When a prenuptial agreement purports to inhibit remedies provided by statute, it should be rather strictly construed." *B.J.D. v. L.A.D.,* 23 S.W.3d 793, 800 (Mo. App.2000). Here, although the record does not reveal whether Raymond abused his right to characterize and designate assets generated from other assets, the validity of the agreement is determined as of the date of its execution. *In re Marriage of Thomas,* 199 S.W.3d at 861. The agreement, by its terms, allowed Raymond to generate a large estate of non-marital property while limiting the distribution to Susan (upon dissolution) exclusively to a formula to be in lieu of maintenance, even after a twenty year marriage in which Susan had devoted her efforts to raising the children and running the household and thereby supporting Raymond's business.

All of these factors, combined, support the trial court's determination that the prenuptial agreement was invalid and not enforceable.

The point is denied.

### Classification of Property

Raymond claims the trial court erred in its classification of marital and nonmarital property. He argues that the determination is not supported by evidence, goes against the weight of the evidence, and misapplies the law. Raymond says that the prenuptial agreement is valid, and therefore the determination of nonmarital property must be made in accordance with the terms of the prenuptial agreement. Because we have affirmed the trial court's finding that the prenuptial agreement was invalid, we need not address this point.

The point is denied.

### Property Division

■ Raymond claims that the trial court erred in awarding Susan an unequal division of property. He argues that the award is against the weight of the evidence and misapplies the law. Raymond says that the court put undue weight on the fact that he has a girlfriend and failed to consider Susan's conduct. He also claims that the court overstated his income and financial resources. The value of his financial resources was a question of fact, as to which the court made a credibility determination. While the division of marital property was not equal, it was not shockingly disproportionate. Susan received $238,000 in marital assets, but the court granted Raymond a judgment against Susan for $158,400. Raymond was assigned responsibility for the debts, which exceeded $107,000. Raymond was allowed to retain all of his stock in the business, which

was of undetermined value. No abuse of discretion is shown here.

### Attorneys' Fees

■■■ The court awarded Susan an additional $22,000 in the form of an award of attorneys' fees. The judgment states:

The basis for an award to [Susan] of her attorney fees (in the form of a higher division of marital assets) is that [Raymond's] affair is the cause of the dissolution of the marriage. [Raymond] has chosen to break his marriage covenant for the sole reason that he wants to trade what he feels is his less-exciting wife for a more exciting one. Additionally, much of the expense of this dissolution is a direct result of [Raymond's] disregard of corporate formalities in that he moves money and assets between family to company without any paperwork to support the transfers, sales, or loans, blurring all distinction between the two. Finally, [Raymond's] earning capacity far exceeds [Susan's]. For these reasons, [Raymond] should be primarily responsible for the extraordinary expense of this proceeding.

Raymond's argument discusses the law pertaining to awarding attorneys' fees, including a discussion of the factors set forth in section 452.355.1. The decision by the court to refer to the attorneys' fees as a "division of marital assets" introduces confusion as to the standard of review. We see no indication that it is proper to merge together the concept of division of assets and the concept of attorneys' fees. Despite the trial court's terminology, we will review the award of attorneys' fees under section 452.355 rather than as a division of property.

■■■ Section 452.355.1 provides that a court may award attorneys' fees in a dissolution case "after considering all relevant factors including the financial re-sources of both parties, the merits of the case and the actions of the parties during the pendency of the action." "We review the trial court's decision to award attorneys' fees for an abuse of discretion." *Groenings v. Groenings*, 277 S.W.3d 270, 279 (Mo.App.2008). "An abuse of discretion occurs where the trial court's award was so arbitrary and unreasonable and against the logic of the circumstances as to shock the sense of justice and indicate that the trial court did not carefully consider its decision." *Id.* at 280. "The party requesting an award of attorney fees in a dissolution action has the burden of proving his or her entitlement to such an award." *Id.* "Even if the trial court does not expressly indicate that it considered all of the factors under [section] 452.355, we presume that it did consider all the factors, and the complaining party bears the burden of overcoming that presumption." *Hart v. Hart*, 210 S.W.3d 480, 493 (Mo.App.2007).

■■■ "While a spouse's inability to pay is not required to support an award of attorney's fees, the award must consider the financial position of each spouse." *Groenings*, 277 S.W.3d at 280. "However, the fact that one party earns more than the other, standing alone, does not compel an award of attorney fees." *Id.* "The trial court is also permitted to consider a spouse's conduct during the marriage in determining whether an award of attorney's fees is appropriate." *Id.* "The trial court may grant a partial award of attorney fees, even if the parties' financial condition does not otherwise necessitate an award of fees, where misconduct has taken place." *Hart*, 210 S.W.3d at 494.

The trial court found that Raymond earns more money than Susan, that Raymond was guilty of marital misconduct, and that Raymond's actions increased Susan's legal expenses. These findings are

supported by the evidence deemed credible by the trial court. It is also true that Raymond's financial affairs were not simple, requiring a significant amount of time to be invested by Susan's attorney. Raymond complains that the trial court failed to acknowledge Susan's misconduct. The trial court presumably found that Susan was not guilty of misconduct. *See id.* (inferring from an award of attorneys' fees in favor of wife that the trial court apparently did not agree with husband's claims that wife was guilty of misconduct). Raymond fails to show why the court should have regarded Susan as guilty of misconduct affecting the marriage. We cannot say that the award of attorneys' fees was an abuse of discretion.

The point is denied.

### Maintenance

■ Raymond claims that the trial court erred in awarding maintenance to Susan. He argues the award goes against the weight of the evidence, is not supported by the evidence, and misapplies the law. Raymond says the prenuptial agreement is valid and provides a formula to determine the amount of money to be awarded to Susan in lieu of maintenance. He says that even if the prenuptial agreement is not valid, then the amount of maintenance awarded to Susan is still too high because it does not take into consideration the child support Susan receives and her other financial resources. Raymond also says the court did not properly consider his financial resources because the income the court imputed to him is too high.

■ "A trial court is vested with broad discretion in granting maintenance within a dissolution decree." *McMullin,* 926 S.W.2d at 111. We will reverse an award of maintenance only if the trial court abuses its discretion "by acting against the weight of the evidence or by erroneously declaring the law." *Id.* at 111–12. "Unless the amount is patently unwarranted, or is wholly beyond the means of the spouse who pays, interference by this court is inappropriate." *Id.* at 112.

■ "Before maintenance may be awarded, a trial court must find the spouse seeking such an award 1) lacks sufficient property, including marital property granted to him, to provide for his reasonable needs; and 2) '[i]s unable to support himself through appropriate employment.'" *Id.* at 112 (*quoting* section 452.335). "In the past, alimony was usually awarded to enable the spouse to live according to her standard of living at the time of the divorce decree." *Id.* "After passage of the Dissolution Act, however, reasonable needs did not automatically equal the standard of living enjoyed during the marriage." *Id.* Section 452.335.2 states:

The maintenance order shall be in such amounts and for such periods of time as the court deems just, and after considering all relevant factors including:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The comparative earning capacity of each spouse;

(4) The standard of living established during the marriage;

(5) The obligations and assets, including the marital property apportioned to him and the separate property of each party;

(6) The duration of the marriage;

(7) The age, and the physical and emotional condition of the spouse seeking maintenance;

(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;

(9) The conduct of the parties during the marriage; and

(10) Any other relevant factors.

The court found that Susan was not able to support herself with her own employment at the time of judgment and that she had insufficient property with which to support herself. It found her reasonable monthly expenses to be $3,627 and her income to be $1,127 per month. It considered the factors set forth in section 452.335.2 and awarded $2,500 per month in maintenance.

Raymond makes several arguments concerning application of the prenuptial agreement. Because we do not quarrel with the trial court's conclusion that the agreement is not valid, we need not discuss these arguments.

Raymond also argues that the trial court arrived at the amount of maintenance by subtracting Susan's income from her expenses. He claims error because the trial court neglected to include the child support awarded to Susan ($1,180 per month) when tallying Susan's income. He forgets that the child support is for the needs of the children, not for Susan's personal needs. Raymond fails to show that the court erred in its calculation of a reasonable sum for maintenance.

Raymond further argues that the trial court's determination of his income is against the weight of the evidence. He states that his business has suffered significant financial difficulties over the past several years and that the trial court's finding that the decline will not continue into the future is not supported by evidence. The trial court imputed $12,000 in monthly income to Raymond. He claims that his reasonable income should have been set at $5,417 based on his testimony that he could earn between $60,000 and $70,000 per year working for another company. He forgets that he failed to demonstrate by credible, documented evidence that his company is insolvent. Thus, he failed to show that he must seek employment elsewhere.

The dissolution trial was held in June and July 2008. On their 2005 tax returns, the parties indicated $98,500 in wages and $66,626 in rental real estate income. On their 2006 tax returns, the parties indicated $52,000 in wages and $70,055 in rental real estate income. The trial court found that Raymond has *consistently* earned $80,000 in wages, $44,000 in rent, and $100,000 in various other company withdrawals. The court attributed $12,000 per month ($144,000 per year) in income to Raymond. This finding is supported by the 2005 and 2006 tax returns, along with the fact that Raymond's testimony suggests that once the 2003 dispute is fully resolved, the company is likely to be more profitable.

Raymond argues that the maintenance award leaves him insufficient funds to provide for his reasonable needs. He states that paying $2,500 in maintenance and $1,180 in child support will leave him with only $1,737 to meet his monthly expenses. He notes that he was awarded $106,949.78 in debt. This argument, of course, presupposes that $5,417 as opposed to $12,000 is attributed to Raymond as salary. Because the $12,000 figure is supported by sufficient evidence, Raymond's argument that

he lacks funds to meet his needs is without merit.

The point is denied.

### Child Support

Raymond claims the court erred in the amount of child support awarded to Susan. He argues the award was not based on substantial evidence and misapplied the law. Raymond says the court should not have included maintenance on the Form 14 calculation because it is excluded by the prenuptial agreement. He also says that, based on the parenting time he was awarded in the parenting plan, he is entitled to a greater overnight credit on the Form 14. Raymond states that the amount of income imputed to him is not supported by the evidence because his business has declined and does not yield a profit. Once again, Raymond wants to view the evidence only from his own point of view, without considering that the court, as factfinder, did not need to believe all that Raymond said. Raymond says that the court improperly excluded the expert testimony of an accountant pertaining to his business; but as we have noted, Raymond does not show that a proper foundation was laid for the accountant's testimony.

The trial court follows a two-step procedure when determining child support awards in compliance with section 452.340 and Rule 88.01. *McCandless–Glimcher v. Glimcher,* 73 S.W.3d 68, 72 (Mo.App.2002). "In the first step, the trial court must determine and find for the record the presumed child support amount under Form 14." *Id.* at 73. "In the second step, the trial court, after considering all relevant factors, must determine whether to rebut the [presumed child support amount] as being unjust or inappropriate." *Id.*

"In determining the presumed child support amount under the first step of the procedure ... the trial court can either accept one of the Form 14 calculations submitted by the parties, or reject both parties' Form 14 calculations and prepare its own Form 14." *Id.* "The trial court must reject a Form 14 calculation if 1) an item is incorrectly included in the calculation; 2) an amount of an item included in the calculation is incorrect; or 3) the mathematical calculation is incorrect." *Id.* "To decide whether the presumed child support amount has been correctly calculated in a Form 14, the trial court is guided by [Form 14]'s directions for completion and comments for use, and the evidence in the case." *Id.* "On appellate review of the correctness of the presumed child support amount, this court review[s] the calculation to ensure that not only [is it] done accurately from a mathematical standpoint, but that the various items and their amounts were properly included in the calculation and supported by substantial evidence." *Id.*

"A trial court may use a party's tax returns in determining the party's income for purposes of calculating child support awards." *Mayben v. Garren,* 286 S.W.3d 854, 856 (Mo.App.2009). "The court, however, is not required to adopt the determination of income for income tax purposes as its determination of income for purposes of calculating presumed child support." *Id.* at 856–57. "Form 14 allows the trial court the necessary flexibility to determine a parent's income for the purposes of fixing child support in light of what the court has discovered during proceedings on the matter." *Id.* at 857.

The trial court rejected the Form 14 submitted by the parties. Instead, it prepared its own Form 14. The court found that Susan was capable of earning minimum wage and attributed that to her. It

found that Raymond has consistently demonstrated the ability to earn approximately $12,000 per month. It found no reason to believe that this pattern would not continue in the long term. The court found that, in the short term, the evidence is that Raymond's income may be smaller until the effects of past accounts receivable defaults can be corrected. The trial court determined that all company payments to Raymond that were credited to the company's "due from shareholder" account are not really loans from the company, but rather were compensation withdrawals. The court determined that these withdrawals were Raymond's salary taken in a manner so as to defer his tax liability.

Raymond also reiterates the argument he made in the section discussing maintenance. He claims that the trial court erred in determining his income. He again focuses on evidence contrary to the judgment. He complains that one of his proffered expert witnesses, an accountant who would testify that Raymond's business was spiraling downward, was improperly excluded because the expert had not conducted an adequate audit. Raymond, however, does not set forth an argument that the expert was qualified to provide an admissible opinion. We do not assume error occurred merely because Raymond says so; the fact of error must be demonstrated by argument and by references to the record. Raymond, however, seems not to understand this. He cites the expert's proffered testimony along with his own testimony as evidence the court should have relied on in determining the likely earnings of his business. Again, this is contrary to the standard of review. "In reviewing the record, this court views the evidence in the light most favorable to the trial court's judgment, and defers to the trial court's credibility determinations." *McCandless–Glimcher*, 73 S.W.3d at 72.

Raymond also claims error in providing him an insufficient adjustment for overnight parenting time. Line 11 of the Form 14 pertains to "[a]djustment for a portion of amounts expended by the parent obligated to pay support during periods of overnight visitation or custody." The directions and comments indicate that "[t]he adjustment shall be calculated by multiplying the basic child support amount from line 5 by the applicable adjustment from the table below. This adjustment is based on the number of periods of overnight visitation or custody per year awarded to *and exercised* by the parent obligated to pay support under any order or judgment." (Emphasis added.) Also, Comment B(1) indicates that the presumed amount may be rebutted if the parent "does not exercise" the period of parenting time provided under the judgment.

The parenting plan provides for Raymond to have 160 overnights per year with the children. Thus, if all of that parenting time were being exercised, Raymond would clearly be entitled to an overnight credit greater than 6%. However, the evidence at trial was that he was not exercising many of his overnight visitations with the children under the temporary custody order. The evidence was consistent with an overnight visitation credit of 6%. The court was entitled to consider whether it was likely *in the near future* that more overnight visitation would be exercised. Given our standard of review, we cannot say a 6% overnight credit is error. Under Comment B(1) of the Directions and Comments, the percentage set forth in Line 11 is rebutted. If Raymond begins to actually exercise more overnight parenting in the future, an adjustment could be made at that time.

The point is denied.

## Attorneys' Fees on Appeal

 Raymond claims that the trial court erred in ordering him to pay $5,000 for Susan's attorneys' fees on appeal and costs on appeal. He argues that the ruling was an abuse of discretion, was not based on substantial evidence, and misapplied the law. Raymond says the trial court must consider the *current* financial condition of the parties before making an award of attorneys' fees on appeal. He says no competent evidence was presented to the court regarding the parties' then current financial status. Raymond also claims that the court's ruling was based solely on speculation and statements of counsel with no testimony presented by either party as to their then current financial condition or Raymond's ability to pay Susan's attorneys' fees. He notes that the fact that one party is appealing does not mean he or she is obligated to pay the other party's attorneys' fees on appeal. Finally, he states that even if the court considered the evidence presented at the underlying dissolution trial, it did not consider the financial condition of the parties between the time of the dissolution and the time of the hearing on the motion for attorneys' fees as it is required to do.

 "Section 452.355.1 permits the trial court to award attorneys' fees on appeal of a dissolution decree." *Groenings,* 277 S.W.3d at 280. "A party seeking attorney's fees on appeal must show the extent of the necessary services to be rendered by counsel, and the expenses related thereto, so that the trial court may make an award based on evidence of such services and expenses." *Id.* "The trial court is considered an expert on the necessity, reasonableness, and value of attorney's fees." *Id.* "We presume the trial court's award is correct and we will reverse the award only upon a showing that the trial court has abused its discretion." *Id.*

 "The party requesting an award of attorney's fees has the burden of proving entitlement to such award." *Andrews v. Andrews,* 290 S.W.3d 783, 787 (Mo.App.2009). "In determining the propriety of an award of appellate attorney's fees in a dissolution action under Section 452.355.1, the court must consider the financial history of the parties since the dissolution being appealed was granted." *Id.* "Moreover, when awarding attorney's fees, a court must know what debts each party owes, as well as what employment and non-employment income each party has, before it can determine either need or ability to pay such fees." *Id.* "One spouse's superior ability to pay will suffice to support an attorney's-fee award." *Cosby v. Cosby,* 291 S.W.3d 795, 800 (Mo.App. 2009). "In addition, the trial court may consider a spouse's conduct during the marriage in making its determination." *Id.*

The dissolution trial was held in June and July 2008. The first amended judgment was entered on September 24, 2008. The hearing on the motion for attorneys' fees on appeal was held on November 25, 2008. Neither party testified at the November hearing. The hearing consisted solely of statements of counsel and questions from the judge to counsel. The trial court, of course, had not forgotten the facts of the relative financial positions of the parties. Susan's attorney argued that she be awarded attorneys' fees on appeal because: (1) the allegation made by Raymond regarding the custody designation was without merit, and Susan would have to defend against that allegation; (2) Raymond had funds to pay for the transcript on appeal; (3) Susan decided not to file her own appeal from the judgment because of lack of funds; and (4) if the issues raised are important enough for Raymond to appeal, they should be important

enough to Raymond for him to pay Susan's attorneys' fees on appeal.

Generally, the court is to consider the financial resources of the parties since the dissolution, even if the time period between the dissolution hearing and the appellate fee hearing is relatively short. *See Davis v. Schmidt,* 210 S.W.3d 494, 517 (Mo.App.2007) (the hearing on Mother's motion for appellate attorney fees took place approximately eight months after trial without evidence of Mother's post-dissolution financial condition). *See also Mozingo v. Mozingo,* 779 S.W.2d 284, 285 (Mo. App.1989); *Eckstein v. Eckstein,* 748 S.W.2d 945, 948 & n. 2 (Mo.App.1988); *Heins v. Heins,* 783 S.W.2d 481, 485 (Mo. App.1990).

Unlike *Davis,* in which the trial court awarded $25,750 in advance of the appeal some eight months after the dissolution judgment, 210 S.W.3d at 517, here the amount was essentially the cost of the transcript (estimated at $4,700) awarded some four to five months after the dissolution trial. The court acknowledged that the economy was "tanked." But the court went on to ask counsel for additional information, reminding them that "maybe [Raymond] does have some good business and there is income coming through his business, but how do we know?" Susan's attorney asked the court to consider the evidence from the dissolution trial (in which the court found that Raymond received about $12,000 per month through his business—in contrast to her minimum wage earnings—and that such income from the business was likely to continue). Raymond objected to a re-presentation of such evidence; Raymond, however, did not offer to present any evidence of his own as to any *current* factors affecting Raymond's financial resources. If Raymond could have presented evidence that would have been helpful to his cause, he should have

spoken up at that time. If his own financial well-being, or that of the business, was suffering, and especially if he had any new information, or any new way of documenting and clarifying the facts as to his alleged troubles, he should have said so. Although the court was not expressing interest in re-plowing the same ground with the same exact offer of information, the court was clearly open to hearing any new evidence. Raymond should not be allowed to sit silently by while possessing undisclosed pertinent information without offering to disclose it, and then, after the ruling, accuse the court of error. A party cannot be allowed to invite error in that fashion.

We fail to see any trial court error here. Unlike in *Heins* and *Davis,* the trial court here did not prevent Raymond from offering testimony as to any post-trial change in his financial circumstances.

This case also does not involve an exorbitant amount for a pre-appeal award. The case involves complicated issues, including a prenuptial agreement, maintenance, child support, and custody related issues. There is no question that Raymond's business historically had been a good, well-established, and productive business. The discovery and litigation need not go on *ad nauseum* when the party who allegedly believes there is a recent hardship change does not say so, and does not offer to present pertinent information. We do not view the attorney's fee award statute as requiring an additional evidentiary hearing *every* time there is a motion for attorney's fees, especially when the parties are silent about the need to consider post-trial information. If some cases seem to suggest such a mandatory requirement, we would tend to differ as a matter of statutory interpretation. It is enough, here, that the court gave appropriate consideration to the recently pre-

sented and historical financial condition of the parties, along with the fact that (1) the court obviously would have welcomed any information Raymond sought to present, but Raymond did not offer any information, and (2) the attorneys' fees award barely covered the cost of the transcript. We discern no error in the court's common sense handling of the matter. The court also did not abuse its discretion in the amount awarded.

The point is denied.

### Conclusion

Based on the amount of parenting time allowed Raymond in the trial court's judgment, Raymond is, for all practical purposes, a joint physical custodian. *See Russell*, 210 S.W.3d at 193–97. In any event, even if remand for amendment were appropriate, it is not necessary. Raymond is a joint physical custodian. Rule 84.14.

Having carefully reviewed Raymond's other points on appeal, we find no ground for reversal of the trial court's rulings. The judgment is amended to show that Raymond is a joint physical custodian. *Id.* The judgment is otherwise affirmed. Each party shall bear its own costs on this appeal.