**Howard L. THACKER, Respondent,**

v.

**Maryam Kayumova THACKER, Appellant.**

**No. WD 71266.**

Missouri Court of Appeals, Western District.

June 8, 2010.

---

Connie J. Clark, Osage Beach, MO, for Appellant.

Wallace W. Trosen, Kirksville, for Respondent.

Before Division I: KAREN KING MITCHELL, Presiding Judge, and LISA WHITE HARDWICK and CYNTHIA L. MARTIN, Judges.

KAREN KING MITCHELL, Presiding Judge.

Appellant Maryam Kayumova Thacker ("Wife") appeals the Circuit Court of Miller County's ("trial court") judgment of dissolution of the marriage between Wife and Howard Thacker ("Husband"). We affirm the judgment of the trial court.

**Factual and Procedural Background**

Wife, a Russian school teacher, met Husband, a retired physician, over the internet on November 30, 2005. The two communicated by internet and then by telephone two to three times per week. In June of 2006, Husband traveled to Russia to meet Wife in person and to meet her daughters. Husband and Wife had discussed the possibility of marriage prior to Husband's arrival in Russia, and while he was there, he asked Wife to marry him. She accepted Husband's proposal because she loved him and thought that he would make a good husband for her and a good father for her daughters. Husband had also recently purchased a house, and he

excitedly showed Wife pictures that he had taken of the house and of his car.

After Husband returned to the United States, he kept in contact with Wife over the telephone and the internet. The e-mail messages that Husband sent to Wife professed his love for her and his excitement over the prospect of their becoming a family. One e-mail message sent in August of 2007 suggested that Wife would pick out a new Toyota Sequoia when she arrived in the United States and included photos of the vehicle in various available colors.

In January of 2008, Husband submitted Affidavits of Support to the Department of Homeland Security stating that Husband intended to contribute to the support of Wife and her daughters, that he would marry Wife and adopt her daughters, and that they would be a family. Husband also sent a letter to the American Embassy in Russia to facilitate Wife's visa. The letter stated his intention to marry Wife and provided financial information regarding Husband's assets and income. Husband suggested to Wife that she have her ex-husband sign away his parental rights to Wife's daughters to facilitate her visa.

Anticipating her move to the United States and her marriage to Husband, Wife sold her apartment in Russia, perhaps for a discounted price, and sold many of her possessions and several of her daughters' possessions. She wanted to be ready to leave Russia as soon as her visa was approved. After making travel preparations, Wife sent all of the remaining proceeds from the sale of her assets to Husband in the United States.

Wife and her daughters arrived in the United States at the end of January 2008. Wife and her daughters immediately moved in with Husband. Wife's daughters, ages thirteen and sixteen, were frightened to live in Husband's house because there was no solid fence around the house, as there apparently is around most Russian homes, and because they believed that they heard noises in the attic or outside of their windows.

Wife's youngest daughter, R.K., was particularly frightened and had trouble sleeping. Wife testified that in mid-February, R.K. asked whether she might come in and sleep in Husband's and Wife's bedroom. Husband agreed to allow R.K. to sleep with them, but only if she slept in the middle. At about four o'clock in the morning, R.K. awoke Wife and was visibly upset. R.K. reported to Wife that Husband had touched her inappropriately.[1] Wife confronted Husband about the incident the next morning and he denied R.K.'s story, suggesting she had just had a bad dream. Husband assured Wife that, in any event, it would not happen again, and Wife decided to forgive Husband and give him another chance because she loved him and did not want to return to Russia.

Wife married Husband March 29, 2008, but the marriage was troubled. Wife testified that she did not like the way Husband spoke to her, Husband's frequent pornography viewing, Husband's constant demands for sex, the presence of Husband's loaded firearms in the house, and Husband's taking photos of her daughters. Husband testified that Wife was never happy, that she complained about the house, and that he was disappointed that

---

1. The trial court made no findings with respect to this alleged incident, noting that even if Wife's allegations were true, the alleged incident occurred prior to the marriage and is thus legally irrelevant as to her claims of maintenance. We agree with the trial court's analysis and mention the alleged incident only as background and to explain why Wife and her daughters left the marital residence.

Wife's interest in sex seemed to decrease after the marriage. He stated that he did not like the attitudes of Wife's teenage daughters and did not believe that they helped enough around the house.

On May 29, 2008, a Missouri Department of Social Services worker visited the Thackers' home because someone had reported the February alleged incident between Husband and R.K. An investigation was conducted and all family members were interviewed. Wife and the Social Services worker testified that the Social Services worker advised Wife that she should remove her daughters from the house immediately or that Husband should leave the house, but that the girls would not be allowed to stay in the home with Husband. Wife took the girls and moved into a shelter. A few days later Wife attempted to reconcile with Husband, but he refused and petitioned the court for dissolution of the marriage. Wife filed a counter-petition seeking spousal maintenance and child support on the theory that Husband's representations to the Department of Homeland Security in January of 2008 evidenced an express contract between Husband and Wife that Husband would provide financial support for Wife and her daughters and, arguably, that Wife and her daughters relied, to their detriment, on Husband's representations promising support, so that Husband should be estopped from denying any obligation to support them after the dissolution.

The trial court entered a judgment dissolving the marriage. At the time the judgment was issued, Wife had obtained a social security number and was employed as a teaching assistant, earning a gross monthly income of $1,058.21. The trial court found that when Wife accepted Husband's proposal of marriage in June of 2006, Husband had not made representations to Wife that he would adopt her children and treat them as his own. The trial court further found that neither Husband's affidavits of support submitted to the Department of Homeland Security in January of 2008 nor his letter to the American Embassy in Russia established the existence of an express or implied contract to provide support to Wife and her daughters in the event of the couple's divorce. As to Wife's estoppel theories, the trial court found that life for Wife and her daughters in Russia was difficult; that Wife had not received support from her ex-husband for her daughters; and that Wife and her daughters wanted to come to the United States and chose to remain. Thus, any reliance by Wife and her daughters on Husband's promises of support was not to their detriment.

Of the marital assets, the trial court awarded Wife a 1993 Ford Explorer that Husband had purchased for her; $19,712 representing a portion of the interest income earned during the marriage; $2,956 representing stock dividend income during the marriage; and ordered Husband to pay $3,000 of Wife's attorney fees. The trial court awarded Wife no maintenance and no child support. Wife appeals.

### Standard of Review

■ We review a trial court's judgment in dissolution proceedings under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will reverse the judgment of the trial court if there is no substantial evidence to support it, if it is against the weight of the evidence, if it erroneously declares the law, or if it erroneously applies the law. *Id.* We defer to the trial court's judgment as to credibility of witnesses and evidence. *Potts v. Potts*, 303 S.W.3d 177, 184 (Mo. App. W.D.2010).

## Legal Analysis

■ Wife's first point on appeal is that the trial court erred in failing to award child support because Husband and Wife had expressly contracted for Husband's support of the children in exchange for Wife's agreement to marry Husband. Wife's first point has three subpoints: (1) that the trial court erred in determining that an agreement to marry could not constitute consideration in a contract for support; (2) that the trial court erred in finding that Wife failed to state a claim upon which relief could be granted; and (3) that the trial court erred in finding that Wife did not meet her burden of establishing an express contract for child support. Because we agree with the trial court that Wife did not establish that an express contract of support existed, we need not address Wife's other two subpoints.

■ Generally, a step-parent must provide support for his or her step-children so long as the step-children reside in the same house as the step-parent. § 453.400.1.[2] The obligation for the step-parent to provide support ends, however, when the step-children no longer live with the step-parent. *Id.*; *White v. White*, 293 S.W.3d 1, 16 (Mo.App. W.D.2009). Of course, a couple may contract to have child support continue even after the step-child no longer lives with the step-parent. *L v. L*, 497 S.W.2d 840, 841–42 (Mo.App.1973).[3]

For Wife to establish that she and Husband expressly contracted for Husband to continue supporting Wife's daughters after he was no longer statutorily required to do so, Wife would have to have established that, in exchange for her promise to marry Husband, or for some other consideration, Husband promised to Wife that he would support her daughters, even if they no longer lived with him. Wife testified at the trial that she married Husband because she loved him and because she thought that he would make a good father and a good husband, and not specifically because Husband had promised to support her daughters. In fact, all of the evidence of Husband's promises or intentions that Wife provided to the trial court originated well after Wife had accepted Husband's marriage proposal.[4] Therefore, we agree with the trial court's conclusion that Wife's agreement to marry Husband was not, in this case, consideration for an express contract for Husband's support of Wife's daughters. Point denied.

■ Wife's second point on appeal is that the trial court erred in failing to order child support for Wife's daughters based upon her theory of estoppel. Again, the trial court found that Wife had failed to state a claim upon which relief could be granted or, in the alternative, that she had not met her burden with respect to her claim of estoppel. Because we agree with

2. All statutory references are to RSMo 2000 unless otherwise noted.

3. Contracts are generally wholly separate from issues in dissolution proceedings. Thus, had Wife successfully shown that an express or implied contract existed, we presume that any contractual "maintenance" or "support" would properly have been awarded, either by the court or by a jury, in a lump sum. We do not, in this opinion, endorse a concept of awarding statutory maintenance or child support for a breach of contract.

4. We agree with Husband that the support affidavits that Husband submitted to the Department of Homeland Security and his letter to the Embassy do not constitute contracts for support. *Stein v. Stein*, 831 S.W.2d 684, 688 (Mo.App. E.D.1992). However, they could still possibly have been evidence to support a finding of an express contract between the parties, especially had they been closer in time to the proposal. In this case, the trial court found no express promise of support, and that finding is not against the weight of the evidence.

the trial court that Wife did not meet her burden with respect to her claim of estoppel, we need not decide whether the trial court erred in finding that Wife failed to state a claim upon which relief could be granted.

■ Our courts have held that support obligations may be imposed based upon an estoppel theory. *See Stein*, 831 S.W.2d at 688; *S.E.M. v. D.M.M.*, 664 S.W.2d 665, 667–68 (Mo.App. E.D.1984). Estoppel cases center upon promises of support made either directly to the children, *S.E.M.*, 664 S.W.2d at 667, or to the children's parent, *Stein*, 831 S.W.2d at 689. *See also White*, 293 S.W.3d at 26 n. 1 (Ahuja, J., dissenting). To establish a claim for child support on an estoppel theory, Wife would have to have proven: (1) that Husband promised to support Wife's daughters; (2) that Wife (or her daughters) had relied on Husband's promise *to their detriment*; (3) that Husband expected or should have expected such reliance; and (4) that injustice resulted from the reliance that only enforcement of the promise could cure. *See White*, 293 S.W.3d at 27 (Ahuja, J., dissenting); *Bauer Dev. LLC v. BOK Fin. Corp.*, 290 S.W.3d 96, 100 (Mo.App. W.D.2009).

In *Stein*, 831 S.W.2d at 689, a couple had agreed to adopt a baby from Korea. The wife in the dissolution proceeding sought an award of support for the child from her husband based upon an estoppel theory. *Id.* The Eastern District of this court held that, because the child was not worse off having been adopted by the wife and brought to the United States than she had been as an orphan in Korea, there had been no showing of detrimental reliance upon the husband's promises to support the child. *Id.*

In this case, even assuming that Wife and her daughters had relied upon promises of support made by Husband in decid-ing to come to the United States, substantial evidence exists to support a finding by the trial court that such reliance was not to the detriment of either Wife or her daughters. Wife testified that her life in Russia was not easy. Although she owned an apartment in Russia, she had to work two jobs to support herself and her daughters. The girls' father did not contribute to their support, and at one time Wife had to sell some of her jewelry to provide for her daughters. Wife testified that her life in the United States was difficult also, yet she had made no attempts to return to Russia with her daughters despite having return plane tickets. On the contrary, Wife had hired an immigration lawyer to facilitate her staying in the United States, and one of her daughters testified at trial that she also wanted to stay in the United States. The trial court's conclusion that Wife failed to meet her burden with respect to her estoppel claim was supported by substantial evidence and was not against the weight of the evidence. Point denied.

■ Wife's third point on appeal is that the trial court erred in failing to award her maintenance because she had established that she and Husband had expressly contracted that he would provide her maintenance and because she meets the requirements of section 452.335 for statutory maintenance. First, for the reasons stated above, we find that Wife's claim for maintenance based upon express contract fails. The evidence supports a finding that Wife married Husband because she loved him and not because of any express promises that he would provide her maintenance after the duration of the marriage.

■ As to the trial court's denial of statutory maintenance, we note that section 452.335 does not *require* an award of maintenance, even if the trial court makes

the required findings that the spouse seeking maintenance lacks the resources to provide for her reasonable needs. We do not reverse a trial court's refusal to award maintenance absent an abuse of discretion. *Hammer v. Hammer*, 139 S.W.3d 239, 240 (Mo.App. W.D.2004). In determining what maintenance is appropriate, a trial court is to consider:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The comparative earning capacity of each spouse;

(4) The standard of living established during the marriage;

(5) The obligations and assets, including the marital property apportioned to him and the separate property of each party;

(6) The duration of the marriage;

(7) The age, and the physical and emotional condition of the spouse seeking maintenance;

(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;

(9) The conduct of the parties during the marriage; and

(10) Any other relevant factors.

§ 452.335.2.

In this case, the trial court found that Wife had roughly $8,000 of non-marital funds; a washer and dryer; the 1993 Ford Explorer that Husband had bought for her; the $22,667 of marital assets awarded to Wife; and the $3,000 toward her attorney's fees to contribute to her support. The trial court also noted that Wife was thirty-seven years old at the time of judgment and in excellent health; that she was college educated in Russia and spoke three languages fluently; and that she had obtained employment. The court specifically reiterated that conduct occurring before the marriage (presumably referring to the alleged incident between Husband and R.K.) was not considered in determining whether maintenance is appropriate under the statute. The trial court therefore concluded that Wife would be able to support her reasonable needs without an award of maintenance. We do not find that the trial court in this case abused its discretion in declining to award Wife maintenance under the statute. Point denied.

 For her final point on appeal, Wife claims that the trial court erred in refusing to award her additional attorney fees because she could not afford her attorney's fees and because she presented valid causes of action at trial. We will reverse the decision of the trial court with respect to its award of attorney fees only if we find that the court has abused its discretion. *Alberswerth v. Alberswerth*, 184 S.W.3d 81, 93 (Mo.App. W.D.2006).

Section 452.355.1 allows the trial court to award attorney fees to a party in a dissolution proceeding after it has considered "all relevant factors including the financial resources of both parties, *the merits of the case* and the actions of the parties during the pendency of the action." (Emphasis added.) In this case, the trial court stated:

Both parties have incurred substantial attorney fees. In regard to [Wife's] request for award of attorney's fees under Section 452.355.1 RSMo., the Court has considered all statutory factors. Pre-

marital conduct is not relevant as a factor for the Court to consider. [Wife's] evidence on her theories of recovery is neither credible nor persuasive and [Husband] should not be required to pay for attorney fees to advance [Wife's] claims which were never credible under the factual scenario of this case. [Husband] should pay his individual attorney fees and $3000 of [Wife's] attorney fees.

Wife claims that the trial court declined to award her more attorney fees because it improperly concluded that Wife's theories of recovery were not supported by Missouri law. She argues that because Missouri courts have held that awards of maintenance and child support based upon theories of contract and estoppel may be had, the court erred in its evaluation of the merits of her case. A plaintiff in an action for breach of contract or on a general estoppel theory, however, is normally not entitled to attorney fees. Just because Wife alleges a breach of contract within the context of an action for dissolution, it does not render her contract or estoppel claims subject to section 452.355.1's discretionary provision of attorney fees. Accordingly, we do not find that the trial court abused its broad discretion with respect to its award of attorney fees. Point denied.

### Conclusion

For all of the above reasons, we affirm the judgment of the trial court.

LISA WHITE HARDWICK, Judge, and CYNTHIA L. MARTIN, Judge, concur.